107 F.3d 13
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Leon SMITH, Robert Cole, Eugene Washington, Paul Marshall,
Tony Hamilton, Linda Hardison, and Kurt Cargle,
Defendants-Appellees.
 Nos. 94-3626, 94-3958, 95-1208, 95-1285, 95-1373, 95-1390
and 95-1454.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 6, 1997.
Decided Jan. 15, 1997.
 
 Nos. 94-3958, 95-1208, 95-1373, 95-1390 AFFIRMED; Nos. 94-3626, 95-1285 DISMISSED.
 Before FLAUM, EASTERBROOK, ROVNER, Circuit Judges.
 
 Order
 
 1
 Appellants are among 13 defendants charged in two indictments with offenses related to the distribution of cocaine. Two defendants were acquitted; four pleaded guilty, testified for the prosecution at the other defendants' trials, and have not appealed; we have consolidated the appeals of the seven remaining defendants.
 
 
 2
 Eugene Washington was the kingpin; Ronald O'Neal, a college friend from their days at the University of Southern California, the chief lieutenant. Several other principals also met Washington at college. Defendants distributed more than 100 kilograms of cocaine in Chicago. The group set up the Shabazz Meat Company to serve as a front and kept elaborate records (by hand and on computer), referring to drugs by code (a kilogram of cocaine was called a "filet," and an ounce a "ribeye"). The company also sold some meat, but not much: the defendants could document only two deliveries of meat to the company.
 
 
 3
 Appellants raise distinct but to a degree overlapping issues, which we discuss one appellant at a time. We treat only their principal contentions; other points, which we do not cover explicitly, have been considered and rejected.
 
 
 4
 Leon Smith, No. 94-3626. Smith, who pleaded guilty and was sentenced to 135 months' imprisonment, argues that his sentence should be lower. There is an open question whether his appeal is timely: he was sentenced on October 6, 1994, but did not appeal until November 3. Later he sought an extension of time under Fed.R.App.P. 4(b), arguing that "confusion between Defendant and his former counsel" led to the delay. The motion did not explain what had gone wrong and why it was excusable neglect; the district court's order granting the extension is unreasoned. Cases such as United States v. Marbley, 81 F.3d 51 (7th Cir.1996), hold that this is not enough. A memorandum filed after oral argument narrates circumstances that might be excusable neglect, but these have not been presented to the district court. We need not remand for further proceedings on this subject, however, because there is a second jurisdictional bar: Smith sought but did not receive a discretionary downward departure, and we lack jurisdiction to review its denial. United States v. Franz, 886 F.2d 973 (7th Cir.1989).
 
 
 5
 Smith argued to the district judge that he satisfies the requirements of the safety-valve statute, 18 U.S.C. § 3553(f), which requires a district judge to disregard a statutory minimum sentence (if five criteria have been satisfied) and to impose a sentence within the applicable Guideline range. The statutory minimum for Smith was 120 months; the bottom of his Guideline range was 135 months. Section 3553(f) offers no relief; Smith received the lowest sentence in the range. The prosecutor asked the district judge to depart downward from this range; she declined. Smith argues that § 3553(f) permits a departure not only from the statute but also from the Guidelines. Such a claim finds no support in either the text of the statute or the caselaw, but even if we were inclined to agree with Smith (and we need not reach the subject) it would do him no good unless it compels a judge to depart from the Guidelines, which it does not. So Smith is seeking a discretionary departure, and we lack jurisdiction to entertain his appeal.
 
 
 6
 Robert Cole, No. 94-3958. Cole was convicted by the jury of using a telephone to commit a felony drug offense, and of conspiring with the other defendants to distribute cocaine. After the judge gave Cole a new trial on the conspiracy count, the prosecutor elected to dismiss that charge. His sentence for the communications counts--based on the quantity of cocaine for which Cole was responsible as a conspirator, see U.S.S.G. § 1B1.3; United States v. Watts, 65 U.S.L.W. 3461 (U.S. Jan. 6, 1997)--came to 151 months' imprisonment.
 
 
 7
 Cole contends that the grant of a new trial on the conspiracy count vitiated his other convictions as well, for two reasons: first, that the reason the judge gave when setting aside the conspiracy count is equally applicable to the other counts; second, that once the conspiracy count vanished, there was no underlying offense that his use of the telephone could have facilitated. Neither contention is sound.
 
 
 8
 O'Neal testified for the prosecution at trial. While the jury was deliberating, O'Neal informed the prosecutor that his testimony had been inaccurate in two respects: the location to which he, Washington, and Charles Davis drove on June 15, 1991, and the place in Houston where cocaine had been repackaged on three occasions during 1991. O'Neal also revealed that he had foreign bank accounts (this did not contradict any testimony at trial). The district court concluded that these disclosures might have affected the jury's deliberations on the conspiracy count but could not have affected the substantive counts, which occurred at times other than those on which O'Neal corrected his testimony.
 
 
 9
 Cole sees this as an inconsistent decision: the statements undermined O'Neal's credibility, which pertained to all counts. Yet we do not perceive any inconsistency. The substantive counts were proved by hard evidence that did not depend on O'Neal's veracity. The misstatements were peripheral--small details in a complex story that was narrated in the main through seizures, wiretap evidence, and the defendants' own elaborate records--and of a sort that is to be expected when a witness tries to relate a long-running conspiracy orally. Other defendants were retried and convicted on the conspiracy count at a trial where O'Neal's misstatements and corrections were fully disclosed; evidently the jury did not think that these tidbits mattered. Any grant of a new trial because of new evidence is based on an informed prediction about what effect the evidence will have. Here we have the luxury of a rerun and have learned the information's effect in one jury's mind: none. Cole is not entitled to a new trial on the substantive counts just because the judge bent over backward to avoid even a slight possibility of prejudice on the conspiracy count.
 
 
 10
 The telephone counts did not depend solely on the conspiracy as their predicate offense; the jury also heard voluminous evidence about sales of drugs, and each telephone call was matched to a particular transaction. Although the telephone counts referred to the conspiracy count, that count in turn referenced many substantive wrongs. Cole's convictions therefore stand unimpaired by the fact that he was not retried on the conspiracy count. The evidence was sufficient, and the sentencing also was proper under the principles of § 1B1.3: that Cole was not in the end convicted of conspiracy did not prevent the judge from finding, by a preponderance of the evidence, that he engaged in drug transactions that require the sentence imposed. The concurrent and consecutive terms were imposed in conformity to U.S.S.G. § 5G1.2(d).
 
 
 11
 Eugene Washington, No. 95-1208. Washington, who was sentenced to 360 months' imprisonment following conviction by the jury (twice, on the conspiracy charge), rings changes on Cole's arguments, and we reject his contentions for the same reasons. He also contends that evidence of some drugs was not properly admitted; we discuss one aspect of this contention when we come to Linda Hardison, and the residue here, on the ground that the district court did not abuse its discretion in making the evidentiary rulings. Washington also contends that the district court did not make sufficient findings concerning the quantity of cocaine attributable to his endeavors; to the contrary, the judge made ample findings, amply supported. The judge's skepticism about some of the evidence offered to show the quantities involved worked to Washington's (and the other defendants') advantage. Because the prosecutor has not taken a cross-appeal in search of higher sentences, we need not decide whether the district judge's approach--counting against each defendant only quantities that could be closely linked to that defendant--was unduly favorable to the defendants in light of U.S.S.G. § 1B1.3 Application Note 2(ii), which requires the judge to count all drugs sold in furtherance of the entire joint criminal activity if the transactions were "reasonably foreseeable in connection with that criminal activity."
 
 
 12
 Paul Marshall, No. 95-1285. Marshall, like Smith, pleaded guilty and protests his sentence (96 months' imprisonment). Like Smith, Marshall believes that he was entitled to a safety-valve reduction, this time under U.S.S.G. § 5C1.2, the Guideline corresponding to § 3553(f). And as with Smith's, this appeal is not a proper invocation of our jurisdiction. Marshall received a sentence below both the statutory minimum (120 months' imprisonment) and the bottom of his guideline range (108 months). Whether this departure is based on the prosecutor's § 5K1.1 motion, or the safety value, is of no moment--and how much of a departure a defendant receives is not a subject we are entitled to review.
 
 
 13
 United States v. Burnett, 66 F.3d 137 (7th Cir.1995), qualifies the principle of Franz by holding that a court of appeals may review claims that legal errors affected the starting point for departure, but Marshall has not identified any legal error. The district judge gave a lower downward departure than she might otherwise have done because she believed that inter-conspirator violence showed Marshall to be dangerous. Marshall contends that only violence against victims or bystanders forecloses safety-value reductions. We express no view on this contention, because it is not relevant. It would be presented if the district court had given a sentence of 120 months or above; once the judge decided to impose a sentence below both the statutory minimum and the bottom of the guideline range, Marshall could obtain appellate review only if violence against criminals is a forbidden consideration in determining the degree of downward departure. At oral argument, Marshall's lawyer sensibly disclaimed any such contention. The upshot is that we lack jurisdiction to review his request for a steeper discount from the guideline range.
 
 
 14
 Tony Hamilton, No. 95-1373. Hamilton, twice convicted by juries on the conspiracy count, received a sentence of 150 months' imprisonment. His argument that the charge to the jury was ambiguous--so that the verdict did not determine whether the conspiracy distributed crack as well as powder cocaine--is brought up short by United States v. Banks, 78 F.3d 1190, 1201-04 (7th Cir.1996), and we therefore need not decide whether to follow United States v. Orozco-Prada, 732 F.2d 1076, 1083-84 (2d Cir.1984), and the other cases Hamilton invokes. It is unnecessary here to elaborate on Banks.
 
 
 15
 Hamilton's fallback argument, that he was entitled to a two-level reduction as a minor participant under U.S.S.G. § 3B1.2(b), did not persuade the district court, and he does not persuade us that the district court erred, given the deferential standard of review prescribed by Koon v. United States, 116 S.Ct. 2035 (1996). Couriers are not automatically minor participants. See Burnett. The district court treated Hamilton leniently, resolving several disputes in his favor and absolving him of responsibility for drugs handled by other members of the organization. Cf. United States v. Willis, 49 F.3d 1271 (7th Cir.1995). A further reduction was not required.
 
 
 16
 Linda Hardison, No. 95-1390. Hardison became Shabazz Meat Company's bookkeeper late in 1991 and also transferred earlier handwritten drug records to the computer. Her convictions for conspiracy, and possessing 21.5 kilograms of cocaine with intent to distribute, earned her a sentence of 188 months' imprisonment. She contends that the evidence was insufficient to convict her, but the jury could have found that she well knew what the Shabazz Meat Company sold (what it charged for "filets" and "ribeyes" was three orders of magnitude greater than the going price of beef). Likewise a reasonable jury could have concluded that she exercised control over the 21.5 kilograms of cocaine found secreted in the kitchen ceiling of her house. Although she shared the house with Washington the state of her knowledge and authority was a subject for the jury to determine. After learning that there was more cocaine in her refrigerator, and drug scales and packaging material throughout the house, a sensible jury could have determined that Hardison knew what else was there and had some control over it.
 
 
 17
 The district court permitted the prosecutor to use the 21.5 kilograms of cocaine from the ceiling as evidence not only of possession with intent to distribute but also of the conspiracy itself. Hardison (joined by Washington) contends that, with respect to the conspiracy charge, this cocaine was other-crime evidence and should have been excluded under Fed.R.Evid. 404(b). According to Hardison, the conspiracy ended in 1992, shortly after O'Neal and Marcus Brown were stopped at Union Station while carrying nine kilograms of cocaine in their luggage. O'Neal was arrested on December 3, 1992, and the computer records of the conspiracy peter out soon thereafter. The cache recovered from the ceiling in May 1994 therefore was related to a different criminal venture, the argument concludes. The district judge might have accepted this conclusion, but it is not the only possible inference. An alternative possibility is that Washington abandoned the Shabazz Meat Company front yet remained the head of a smaller cell of conspirators--certainly he did not get out of the drug business!--and carried on the enterprise while taking greater care that the police not be able to find its records. This is the conclusion the district court reached when deciding to admit the evidence, and we do not think it a clear error.
 
 
 18
 One other objection to the use of this evidence remains to be considered. Agents arrived at 6 a.m. with warrants for the arrest of Washington and Hardison. They broke the door with a sledgehammer when the occupants did not open it, and they burst in heavily armed. Washington was naked, and Hardison was in bedclothes. Agents told Hardison that, if she did not consent to a search, they would secure a search warrant. While she was considering what to do, Washington broke into tears, and she could hear him sobbing in the next room. These circumstances, Hardison contends, make her consent to the search of the premises involuntary. The district court found otherwise, however, and we do not think its decision clearly erroneous. (Appellate review on this question is deferential, United States v. Stribling, 94 F.3d 321 (7th Cir.1996); United States v. Yusuff, 96 F.3d 982 (7th Cir.1996), because the Supreme Court has characterized the voluntariness of consent to search as a question of fact. See Ohio v. Robinette, 117 S.Ct. 417, 421 (1996).)
 
 
 19
 Hardison knew that she had a right to refuse to consent and initially did just that. She told the agents that she did not want them making a mess of her house. It must have occurred to her, however, that armed with a warrant the agents could have ripped the house apart, for Hardison soon changed her mind and consented. Advice that the only real options were consent or a warrant was factual, and knowledge of the truth does not make a consent involuntary. Consent often is given at times of mental stress; this too does not spoil the decision. Having expressed to the agents a desire to avoid a destructive search, Hardison argues that the search above the kitchen ceiling exceeded the consent of the search. There are two problems: first, nothing in the record suggests that this search was destructive (the tiles apparently could be pushed up and replaced without damage), see United States v. Torres, 32 F.3d 225 (7th Cir.1994); second, Hardison never attempted to revoke or limit the scope of her consent, cf. Florida v. Jimeno, 500 U.S. 248 (1991). Perhaps Hardison thought that the agents would miss the cache over the ceiling and then neglect to obtain a warrant and make a more thorough search. At all events, the district court did not err in denying the motion to suppress this evidence.
 
 
 20
 Finally, Hardison attacks the district judge's decision to add two offense levels for obstruction of justice. Agents seized from Hardison's home a copy of a letter to Kim Washington, dated shortly after Brown's arrest in September 1993, asking Kim Washington to tell investigators that all nine kilos of cocaine seized at Union Station belonged to O'Neal. Hardison also asked Kim Washington to volunteer to testify to this on Brown's behalf. None of it was true; the letter was a bald attempt to obstruct justice, and the only question therefore was whether it was sent. At sentencing the prosecutor said that an agent of the FBI could testify that he retrieved the original of the letter from Kim Washington. Hardison did not make a contradictory proffer, so the judge was entitled to find that the letter indeed came into Kim Washington's possession, leading to an enhancement for obstruction.
 
 
 21
 Kurt Cargle, No. 95-1454. Cargle pleaded guilty. For its part of the bargain, the prosecution promised to move for a downward departure under U.S.S.G. § 5K1.1 if Cargle provided "complete and truthful information" and "full and truthful cooperation." Cargle stated in the written agreement, and again in open court, that he began buying cocaine from O'Neal in April 1991 and purchased at least 43 kilograms of that drug. In later debriefing sessions, however, Cargle said that he did not start buying cocaine until the fall of 1991, and purchased no more than 28 kilograms. Efforts to clear matters up were not helped when Cargle offered to testify to whichever story the prosecutor preferred (and to make sure that he and another potential witness "had their stories straight")--and then denied that he had ever changed his tune. Deeming the statements untruthful, and the attitude unacceptable, the prosecutor did not call Cargle as a witness and declined to make a § 5K1.1 motion. The district judge imposed a sentence of 168 months' imprisonment.
 
 
 22
 Cargle insists that the prosecutor's "breach" entitles him to withdraw his plea. Yet the district court held a hearing and found that Cargle had made inconsistent statements to the prosecutor--and when statements conflict, one (at least) is untrue. The judge stated: "I find that the government has established by a preponderance of the evidence that Mr. Cargle did not fully comply with his plea agreement." This finding is not clearly erroneous. The prosecutor's decision not to request a downward departure therefore was not a breach; it was the consequence of applying the agreement's terms to Cargle's actions. We reject his contention that, unless his falsehoods were deliberate, the prosecutor had to make the favorable motion. This is not a perjury prosecution. The agreement required truth and cooperation and does not include a culpable-mental-state condition; sudden amnesia would have been a good reason to withhold a sentencing benefit, and so too with inconsistent statements that hid the truth and made Cargle an unsuitable witness. Cargle's further assertion that the district judge did not give the admonishments required by Fed.R.Crim.P. 11(e)(2) is factually unfounded. See Tr. 26-29 (July 12, 1994). Rule 11 does not require additional warnings about the possibility that the prosecutor will find the degree of cooperation unsatisfactory.
 
 
 23
 The judgments in Nos. 94-3958, 95-1208, 95-1373, 95-1390, and 95-1454 are affirmed. Appeals No. 94-3626 and 95-1285 are dismissed for want of appellate jurisdiction.