UNITED STATES of America, Plaintiff–Appellee,

v.

Deral WILLIS, et al., Defendants–Appellants.

Nos. 93–2880, 93–3320, 93–3324, 93–3325, 93–3326, 93–3350 and 94–1876.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1995.

Decided March 14, 1995.

Vilija Bilaisis, Colleen D. Coughlin, Office of U.S. Atty., Crim. Div., Barry Rand Elden, Asst. U.S. Atty., United States Crim. Receiving, Appellate Div., Chicago, IL, Hope P. McGowan, U.S. Dept. of Justice, Narcotic & Dangerous Drug Section, Washington, DC (argued), for U.S.

David W. Gleicher, Chicago, IL (argued), for Larry Martin.

Gerald J. Collins, Chicago, IL (argued), for Stanley Wright.

H. Elizabeth Kelley, Oak Forest, IL (argued), for Eula Scott.

Raymond D. Pijon, Chicago, IL, for Harold Williams.

Before WOOD, JR., FLAUM, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Between 1986 and 1991 Mario Claiborne orchestrated the distribution of many hundred kilograms of cocaine. Prosecutions followed the infiltration of the organization. Five of Claiborne's former henchmen testified for the prosecution at the joint trial of eight conspirators. Claiborne himself agreed to cooperate as part of a plea bargain—but on the stand he reneged, accused the prosecutors of improper conduct, and exculpated the defendants, only to be impeached by grand jury testimony in which he had said almost precisely the opposite in every detail. To top off this performance, after two defendants had finished their cross-examination Claiborne decided that he was fed up and refused to say another word, even after being held in contempt of court. (Claiborne has since been convicted as the kingpin of the drug ring and sentenced to life without parole; it is easy to see why extra time for contempt held no threat for him.) Because only two of the defendants were able to cross-examine Claiborne, the district court directed the jury to disregard his testimony. To avoid confusion, the judge applied that order to all defendants. All were convicted. Those who appeal contend that it was not enough to strike Claiborne's testimony, which they say the jurors were bound to consider despite the court's admonition; they demanded a mistrial and renew that request on appeal.

■ Defendants tell us that Claiborne's testimony was devastating. We doubt it. The grand jury testimony the prosecutor read to Claiborne was damning, all right, but Claiborne disowned it, saying that it was all a script the prosecutor wrote for him and he didn't mean a word of it. Otherwise Claiborne was truculent, and when he said anything he made it plain that he was on the defendants' side. The jurors saw a fickle witness, by his own admission untrustworthy and willing to say anything in a pinch. The two defendants who cross-examined Claiborne did not ask him many questions; he had already done them a big favor, and they hardly wanted him to switch sides again. Claiborne's testimony took less than two days of a two-month trial; the other evidence against the defendants was enough to cook many geese. A judge has substantial discretion to manage trials when events take surprising and unfortunate turns. The district judge did not abuse that discretion in striking Claiborne's testimony and letting the trial proceed. See *United States v. Torres*, 733 F.2d 449, 461 (7th Cir.1984).

■ But wait!, defendants cry. Claiborne was not just any witness; he was a co-conspirator. If he had given an out-of-court statement after the conspiracy, the judge could not have admitted that statement without permitting the defendants an opportunity for cross-examination; using the statement deprives the defendant of the right to confront and cross-examine his accuser. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), applies that principle to ban the admission of one defendant's statement that inculpates another, even when the judge gives an instruction limiting the use of that statement to the defendant who made the admission. The Court thought that jurors would not be able to consider the statement against its author without considering it against the co-defendant. If jurors can't follow this limiting instruction, defendants ask, how can they follow the instruction to disregard Claiborne's testimony altogether?

■ One answer is that jurors, like other people, have trouble distinguishing among uses of information. Told that a piece of information is reliable enough to use against Defendant # 1, the most conscientious juror will have trouble with the idea that it can't be used against Defendant # 2. Even a juror who does his level best to deal separately with the evidence may discover that limitations on human mental skills prevent that. It is much easier to follow an instruction of the kind the judge gave here: don't consider Claiborne's testimony against *anyone.* Such instructions are common in trials. Whether jurors are uniformly able to follow them may be doubted, but courts accept some imperfection because the alternative—doing trials over and over again until one comes out perfect—may be even worse. Cf. *Zafiro v. United States*, —— U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (benefits of joint trials justify tolerating effect that evidence against one defendant may have for another). Evidence is not necessarily better in a second trial, which will be plagued with errors of its own and always must deal with fading memories. In recent years the Supreme Court has told us to accept jurors' ability to follow limiting instructions; although the Court is unwilling to overrule *Bruton,* it has declined to extend it or to construct additional rules that presume jurors' inability to follow instructions. *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). See also *Shannon v. United States*, —— U.S. ——, ——, 114 S.Ct. 2419, 2427, 129 L.Ed.2d 459 (1994); *Gacy v. Welborn*, 994 F.2d 305, 313 (7th Cir.1993). Defendants have not found any case calling for an automatic mistrial when a statement within the scope of *Bruton* is introduced and then stricken from the record. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), and *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), show that *Bruton* errors may be harmless; it follows that when the judge tells the jury to disregard the evidence altogether, and therefore avoids any *"Bruton* error," the trial may continue. Cf. *Greer v. Miller*, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). Claiborne's abortive appearance on the stand did not poison this jury irretrievably; indeed, his exposure to cross-examination by two defendants might well have justi-

fied at least limited consideration of his testimony on direct examination.

■ Although defendants present many other objections to their convictions, none requires separate discussion. Sentencing is another matter. The district judge was entitled to credit the evidence against the defendants and to deny Eula Scott's request for a three-level (as opposed to two-level) reduction for acceptance of responsibility. But four defendants—Harold Williams, Stanley Wright, Christopher Epison, and Deral Willis—raise serious challenges to the quantity of cocaine attributed to them under the relevant conduct guideline, U.S.S.G. § 1B1.3(a)(2).

Williams and Wright were street dealers, selling packages of cocaine for $20 apiece. Each received frequent deliveries from one of the syndicate's couriers. Williams sold an ounce or two per week, Wright two to three ounces. Evidence connected Wright to the Claiborne organization for 18 months at most; Williams may have been involved for less time. The district court attributed to Williams and Wright the entire quantity of cocaine the entire conspiracy sold during the period of their association with it. Wright, who handled 150–225 ounces (roughly 4–6 kilograms), was credited with 214 kilograms of cocaine, which the district judge characterized as a "conservative" estimate of the Claiborne gang's sales during that period. The result for Wright was life imprisonment without possibility of parole, the same as Claiborne himself received; Williams, who was affiliated with the organization for a shorter period, received "only" 360 months' imprisonment. Life in prison for being a street distributor is a shockingly severe punishment, one that removes all marginal incentive to obey the law. If the punishment for simple distribution is so severe, what reason do street dealers have not to engage in mayhem as well?—especially if violence will help avoid detection. See Dilip Mookherjee & I.P.L. Png, *Marginal Deterrence in Enforcement of Law*, 102 J.Pol.Econ. 1039 (1994); Steven Shavell, *A Note on Marginal Deterrence*, 12 International Rev.L. & Econ. 345 (1992). Such a severe penalty for 18 months' participation also curtails the incentive to drop out

and go straight. Then there is a problem of horizontal proportionality: why should being a street dealer for a big organization be punished so much more severely than being a street dealer for a small organization?

■ How much of a conspiracy's total sales each member must answer for depends on the volume that participant could have foreseen and on his role in the operation. E.g., *United States v. Jackson*, 983 F.2d 757, 771 (7th Cir.1993); *United States v. Thompson*, 944 F.2d 1331 (7th Cir.1991). Street dealers are not ordinarily accountable even for quantities they understand higher-ups to be distributing through others. See U.S.S.G. § 1B1.3 Application Note 2 Illustrations (c)(6) and (c)(7). Without discussing these illustrations the district judge concluded that Williams and Wright should have foreseen Claiborne's full sales because they knew that they were part of a big organization and each saw that there were many fellow dealers. Wright associated with three others selling in the same vicinity and, as the government's brief delicately puts it, helped curtail the threat of competition from other organizations at his group's favored locations. Yet none of the evidence we have seen suggests that the street dealers in inner city Chicago recognized that Claiborne was peddling substantial quantities in the suburbs—not one $20 bag at a time, but in kilogram bricks. It may well be proper to impute the whole street crew's sales to each member, and maybe to add the sales of the courier who delivered to this group and others nearby, though even this is problematic; it is highly questionable to leap from one person's knowledge that the organization is big to knowledge of its full scope. The district judge must take a closer look at this subject.

■ If on further consideration the judge adheres to his conclusion that Williams and Wright understood the extent of the Claiborne operation and are accountable under the Guidelines despite Illustrations (c)(6) and (c)(7), the judge should afford each the benefit of a reduction under U.S.S.G. § 3B1.2(b) for being a "minor participant" in the organization. The district judge rebuffed this request after observing that selling several kilograms of cocaine on the street, over

an extended period, is not a minor offense. Indeed not; we have held that one does not get a reduction under § 3B1.2(b) just by being at the end of the chain of distribution, by being a courier, or by serving as a go-between rather than a principal. E.g., *United States v. Pitz*, 2 F.3d 723, 732–33 (7th Cir.1993); *United States v. Osborne*, 931 F.2d 1139, 1156–57 (7th Cir.1991); *United States v. Brick*, 905 F.2d 1092, 1095–96 (7th Cir.1990). But § 3B1.2 does not ask whether the defendant committed a minor offense, or caused only minor social injury; the question is whether the defendant's role in the crime of conviction was minor. Here the crime of conviction is the entire Claiborne conspiracy, and street dealers were significantly less culpable than others in that operation. Guideline 3B1.2 Application Note 3. Even lower degrees of culpability would not entitle Williams and Wright to a reduction if their restricted role were recognized in some other way. Suppose, for example, the district judge were to decide on remand that Wright knew about only the cocaine being distributed on the street in his vicinity (perhaps as much as 25 kilograms during his time). Wright could not be called significantly less culpable than the norm in relation to that understanding of relevant conduct. But if the district judge once again counts the Claiborne operation's entire sales, then the street distributors were assuredly significantly less culpable then the comparison group and should receive the reduction.

 Deral Willis also bought cocaine from the Claiborne organization for redistribution. The details of his reselling transactions are obscure but do not matter here. The district judge concluded that during the nine months over which Willis had provable transactions with Claiborne, the gang acquired at least 24 kilograms of cocaine for resale. The judge imputed all 24 kilograms to Willis, leading to a sentence of 200 months' imprisonment. What we have said about Williams and Wright applies equally to Willis; the district judge needs to make a more detailed inquiry into just what Willis knew about the scope of the organization and the volume of its business, and if need be to adjust the sentence to reflect Willis's relative responsibility for that amount.

■ Christopher Epison held a post closer to Claiborne. He joined the organization by doing odd jobs; Epison was Claiborne's chauffeur and auto repairman but served as a drug courier too. Claiborne registered two cars in Epison's name. Epison handled large sums of cash and on one occasion told Claiborne that the police had seized $30,000 from him. All of this implies that he knew about and under § 1B1.3 is responsible for a good deal of the organization's whole operation. Yet the district judge attributed only 67 kilograms to Epison, leading to a sentence of 188 months' incarceration. We do not think that the district judge abused his discretion in concluding that Epison could foresee operations of this magnitude or in denying a reduction of four levels for minimal participation under § 3B1.2(a). How things turned out for Epison underscores our concern, however, with the attributions to defendants whose own vision of the full operation was no better than Epison's and likely was worse.

The convictions of all defendants are affirmed. The sentences of Harold Williams, Stanley Wright, and Deral Willis are vacated, and their cases are remanded for resentencing. The sentences of the remaining appellants are affirmed.