UNITED STATES of America,
Plaintiff–Appellee,

v.

Miguel PAGAN, Sr. and Francisco
Herrera–Ruiz, Defendants–
Appellants.

Nos. 98–1228, 98–3906.

United States Court of Appeals,
Seventh Circuit.

Argued April 20, 1999.

Decided Nov. 18, 1999.

Andrew B. Baker, Jr. (argued), Office of the United States Attorney, Dyer, IN, for Plaintiff–Appellee.

Patrick T. Driscoll, Jr., Hickey, Driscoll, Kurfirst, Patterson & Melia, Chicago, IL, Domingo F. Vargas (argued), Chicago, IL, for Defendant–Appellant Miguel Pagan, Sr.

Matthew D. Soliday (argued), Valparaiso, IN, for Defendant–Appellant Francisco Herrera–Ruiz.

Before CUDAHY, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Automobiles were not the only thing that Miguel Pagan was selling at the dealership he owned in Hammond, Indiana. A jury concluded that Pagan and his cohort, Francisco Herrera–Ruiz, were involved in a drug conspiracy that used the facilities of Pagan Auto Sales, and it found both men guilty of conspiring to possess with intent to distribute cocaine, heroin, and marijuana, in violation of 21 U.S.C. § 846. It also convicted Pagan of possession of cocaine and heroin with intent to distribute those substances, in violation of 21 U.S.C. § 841(a)(1), and of income tax evasion, in violation of 26 U.S.C. § 7203. For his part, Herrera–Ruiz was also found guilty of possessing with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. § 841(a)(1). None of their challenges to the convictions has any merit, but we conclude that Herrera–Ruiz is entitled to a remand for re-sentencing.

I

Pagan's troubles began after he failed to file income tax returns for 1993 and 1994, an omission that attracted the attention of both the Internal Revenue Service ("IRS") and the Drug Enforcement Administration ("DEA"). Over the course of the ensuing investigation, federal agents collected evidence revealing that Pagan Auto Sales served as a distribution center for drugs transported to the Chicago area from Mexico. Dealers who worked for Pagan typically filled their drug orders by placing a telephone call or sending a fax to Pagan Auto Sales to arrange for a delivery or pick up. Herrera–Ruiz and Pagan himself also dealt directly from the premises of the dealership. On December 18, 1996, a federal grand jury returned a 24–count indictment against Pagan, Herrera–Ruiz, and another dealer, Carlos Santiago.

At trial, the government depicted an extensive drug network coordinated through Pagan Auto Sales, relying heavily on circumstantial evidence (as it commonly does in this kind of case). We mention only the highlights here. Between September 1995 and August 1996, DEA Task Force Officer Raymundo Vasquez staged several drug buys involving Santiago. For the first of these buys, Vasquez enlisted the aid of a confidential informant; thereafter, both the informant and Vasquez himself purchased cocaine from Santiago, most often at Santiago's house but sometimes at the Puerto Rican Social Club. Pagan Auto Sales had a pay telephone that the government had outfitted with a pen register, on which all incoming and outgoing phone calls and faxes were recorded. On four of the eight days when Vasquez or his informant purchased cocaine from Santiago, the pen register indicated phone calls, faxes, or both, between Santiago's home and the dealership.

The last of Vasquez's buys occurred on August 21, 1996. That day, Vasquez went to Santiago's house to purchase cocaine, but Santiago said he did not have any. Santiago then left the room to make a phone call. When he returned, Santiago told Vasquez that his source was "the number one car dealer at Pagan Auto Sales," and the two men arranged to meet at the dealership later that day to complete the deal. When Vasquez arrived at Pagan Auto Sales, Santiago told him that they would have to wait a little while for his source to arrive and that there were other customers on the lot as well. "The

source" arrived at the lot in a grey Lincoln and, after he left, Santiago sold Vasquez cocaine.

DEA Task Force Officer Matthew Argadine coordinated another undercover effort with the aid of an informant named Manuel Aleman. Aleman was a personal acquaintance of Pagan who regularly socialized at Pagan Auto Sales. Argadine paid Aleman a total of $10,500 in exchange for his participation in a series of controlled drug buys. Aleman's transactions were often videotaped, though without audio. On January 6, January 31, February 12, and March 4, 1996, Aleman purchased cocaine from Herrera–Ruiz outside of Las Brisas Restaurant. On August 15, 1996, he purchased cocaine from Herrera–Ruiz at Pagan Auto Sales. Once, on February 14, 1996, DEA agents videotaped Aleman meeting with Pagan at Pagan Auto Sales. Aleman testified that he purchased cocaine during this meeting, but the transaction was not captured on-camera. The government supported Aleman's testimony about the relationship between Pagan and Herrera–Ruiz with entries from the pen register showing a total of 66 phone calls between Herrera–Ruiz and the dealership.

The heart of the government's case was Aleman's detailed testimony about the inner workings of the drug operation. From him, the jury heard that Pagan and Hererra–Ruiz worked with Manuel and Auriliano Diaz, two brothers who used semi-tractor trailers to transport drugs from Mexico to Chicago and northwest Indiana. Aleman stated that one of these trucks carrying 810 kilograms of cocaine and 504 pounds of marijuana had been seized by the Chicago Police while on its way to Pagan Auto Sales. After the seizure, Herrera–Ruiz had warned Aleman that they would have to be careful around the car lot because "the heat was on." In fact, the truck Aleman and Herrera–Ruiz had been discussing had been seized in Texas by the DEA. The driver escaped, but DEA agents transported the truck to Chicago as part of a sting operation in which the DEA had hoped to deliver the load and trap the buyers. This effort was unsuccessful, as no one appeared to claim the load.

When he was arrested on August 29, 1996, Pagan signed a waiver of his *Miranda* rights and then admitted that he knew a man named Victor Quinones who had been the driver of a truck filled with drugs that was seized by the DEA. Pagan also confessed that he had been introducing drug distributors to customers for a long time. He identified the Diaz brothers as major distributors and fingered an individual named "Tito" as his own supplier. "Tito" is the nickname of Santos Torres, Jr. According to the pen register, in September and October 1995, Torres placed two phone calls to the dealership. Additional evidence of a business connection between Pagan, the Diazes, and Quinones included pen register data at Pagan Auto Sales revealing 45 telephone calls between Pagan Auto Sales and Quinones' last known address; numerous checks payable to Quinones and endorsed in his name that had been deposited in the auto dealership's bank account; and the fact that Pagan was the lien holder for several of the Diaz brothers' trucks.

This is a representative sample of the evidence that led the jury to return guilty verdicts against Pagan and Herrera–Ruiz on all counts on April 24, 1997. The court sentenced Pagan to 360 months in prison and five years supervised release, and ordered him to pay a $25,000 fine. It based the sentence on an offense level of 42 under the Sentencing Guidelines, which incorporated the cocaine and marijuana seized in Texas by the DEA and a four-level enhancement for his "leadership role" in the offense. It sentenced Herrera–Ruiz to 324 months in prison and five years supervised release, and ordered him to pay a $10,000 fine. The district court also held Herrera–Ruiz accountable for the truckload of drugs seized in Texas and enhanced his sentence by three levels for his "managerial role" in the offense.

## II

### A. *Sufficiency of the Evidence*

■ The defendants raise several challenges to their convictions and sentences. We begin with their claims based on the sufficiency of the evidence. Both Pagan and Herrera–Ruiz contend that the evidence at trial was insufficient as a matter of law to support their convictions for conspiracy to distribute drugs; Pagan also claims that his conviction for possessing cocaine with intent to distribute was not supported by the evidence. In order to succeed on these arguments, the defendants must demonstrate that the record contains no evidence, regardless of how it is weighed, from which the jury could have found the essential elements of the offenses beyond a reasonable doubt. *United States v. Menting*, 166 F.3d 923, 928 (7th Cir.1999); *United States v. Granados*, 142 F.3d 1016, 1019 (7th Cir.1998).

■ In order to prove a conspiracy charge, the government must show both that a conspiracy existed and that the defendant knowingly agreed to join it. *United States v. Castillo*, 148 F.3d 770, 774 (7th Cir.1998); *United States v. Taylor*, 116 F.3d 269, 271 (7th Cir.1997). Conspiracy, like other crimes, may be proved entirely by circumstantial evidence. All that is necessary is "enough circumstantial evidence to support, beyond reasonable doubt, an *inference* that the defendants agreed among themselves to distribute drugs." *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir.1991); see also *Taylor*, 116 F.3d at 271; *United States v. Turner*, 93 F.3d 276, 281 (7th Cir.1996). As our recitation of the facts demonstrates, there is very little direct evidence that Pagan and Herrera–Ruiz conspired together and with others to distribute drugs. Nonetheless, the circumstantial evidence together with Aleman's testimony is sufficient to support an inference that they did.

■ The conspiracy case against Herrera–Ruiz, while perhaps the weaker of the two, is nonetheless strong enough to support a conviction. The government's evidence included pen register entries indicating that a total of 66 telephone calls were placed between Herrera–Ruiz and Pagan Auto Sales, Aleman's testimony that Herrera–Ruiz worked with Pagan and the Diaz brothers, and the fact that Herrera–Ruiz sold drugs on the premises of Pagan Auto Sales. Herrera–Ruiz responds to this evidence by arguing that Aleman is an unreliable witness because he is a drug dealer and user who was desperate for money when the government offered to pay him for his help. Without Aleman's testimony, Herrera–Ruiz continues, the government cannot prove that his contacts with the auto dealership related to the sale of drugs or, accepting for the sake of argument that he did in fact sell drugs on dealership property, that he was not doing so on his own.

■ True, without Aleman's testimony the case against Herrera–Ruiz would have been thin, perhaps even fatally so. But Aleman testified, and he was not trying to convince the jury that the moon was made of green cheese. Neither Aleman's history of drug use nor the fact that he was paid for his information renders his testimony unreliable as a matter of law. The extent to which Aleman's personal failings and motivations may have influenced his testimony was for the jury to decide. See *United States v. Saulter*, 60 F.3d 270, 275 (7th Cir.1995); see also *United States v. Robinson*, 177 F.3d 643, 647 (7th Cir.1999); *United States v. Owens*, 145 F.3d 923, 927 (7th Cir.1998). Because a rational jury could have believed Aleman's testimony, we cannot overturn Herrera–Ruiz's conviction. The same reasoning applies to Pagan's claim that there was insufficient evidence from which to conclude that he possessed cocaine with intent to distribute. Although the key transaction was not captured on videotape, the jury could rationally have chosen to believe Aleman's testimony that a sale was made.

■ This leaves us with the conspiracy case against Pagan. The evidence of this charge consisted of the entries in the pen register, Aleman's testimony, and Pagan's confession at the time of his arrest. Pagan makes much of the fact that the government could not conclusively establish that Pagan made or received any of the calls recorded in the pen register. Indeed, on their own, the entries certainly would not have been sufficient to establish that Pagan himself was conspiring with drug dealers—Pagan Auto Sales was a popular gathering place and many individuals undoubtedly had access to the pay telephone. But, as the jury heard through the testimony of DEA Task Force Officer Peter Hojnicki, Pagan admitted in his post-arrest statements that he had been introducing drug distributors and customers for many years, that Torres (a.k.a."Tito") was his supplier, and that he knew a truckload of drugs driven by Quinones had been seized by police. If the pen register entries and Pagan's confession were not enough, Aleman's testimony alone would have been sufficient to support the conspiracy charge. Aleman gave the jury a detailed description of the inner workings of the conspiracy, with all chains of command leading back to Pagan. Any efforts to discredit Aleman's testimony at this stage in the proceedings are futile.

### B. *Aleman's and Agent Argadine's Testimony*

■ Relying on the short-lived holding in *United States v. Singleton*, 144 F.3d 1343 (10th Cir.1998), *rev'd en banc*, 165 F.3d 1297 (10th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999), Herrera–Ruiz also urges that his conviction must be overturned because the district court erroneously permitted Aleman to testify in violation of 18 U.S.C. § 201(c)(2), because he had been paid for his work as a government informant. We have already definitively rejected the reasoning of the first *Singleton* decision, and we see no reason to revisit the issue here. See, *e.g.*, *United States v. Mitchell*, 178

F.3d 904 (7th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 362, —— L.Ed.2d —— (1999); *United States v. Condon*, 170 F.3d 687 (7th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 1784, 143 L.Ed.2d 812 (1999). The district court did not abuse its discretion by permitting Aleman to testify.

■ Herrera–Ruiz also argues that he was entitled to a mistrial because of improper and prejudicial testimony by Argadine. Argadine, who was present at Herrera–Ruiz's arrest, testified that after being read his *Miranda* rights, Herrera–Ruiz told the agents where drugs could be found in his apartment. Herrera–Ruiz objected to the statement on the ground that it had not been produced by the government during pretrial discovery and asked for a mistrial. The district court denied the request for a mistrial, but sustained the objection, struck the testimony from the record, and instructed the jury to disregard it. Herrera–Ruiz contends that the district court's instruction was not sufficient to cure the damage caused by the improper testimony. In particular, he claims that if his defense counsel had known that he had received *Miranda* warnings, counsel might have inquired as to whether he was also informed of his right to communicate with consular authorities from his native country—*i.e.* Mexico—under the Vienna Convention on Consular Relations, April 24, 1963, art. 36, 21 U.S.T. 77, T.I.A.S. No. 6820.

Even if the Vienna Convention conveyed an individual right sufficient to implicate the fairness of a subsequent criminal trial, contrary to the Second Circuit's conclusion in *Waldron v. INS*, 17 F.3d 511, 518 (2d Cir.1994), Herrera–Ruiz does not explain what this would have had to do with what the jury heard at trial. Moreover, we do not see why learning that *Miranda* warnings were properly issued at the time of arrest would have alerted counsel to a possible Vienna Convention problem. To the contrary, we would expect counsel to be more concerned if he believed the warn-

ings were not administered. The district court did not abuse its discretion in denying a mistrial.

## III

### A. *Drug Quantity Calculations*

Both Pagan and Herrera–Ruiz have also raised several challenges to their sentences, beginning with the drug quantities on which they are based. See U.S.S.G. §§ 1B1.3, 2D1.1(c). Under U.S.S.G. § 1B1.3(a)(1), Application Note 2, a defendant is "accountable for all quantities of contraband [including controlled substances] with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." See also *United States v. DePriest*, 6 F.3d 1201, 1212–13 (7th Cir.1993). Here, applying that part of § 1B1.3, the court decided that each man was responsible not only for the amount of drugs he handled personally, but also for drugs in the truck that the DEA had seized, which contained a whopping 810 kilograms of cocaine and 504 pounds of marijuana. Pagan and Herrera–Ruiz argue that the record does not support the inclusion of these drug quantities in their offense level calculations.

▮ The quantity of drugs for which a defendant may be held responsible is a finding of fact that we review for clear error. *United States v. Span*, 170 F.3d 798, 803 (7th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 153, —— L.Ed.2d —— (1999); *United States v. Hatchett*, 31 F.3d 1411, 1418 (7th Cir.1994). It is possible to meet that standard if the district court's sentencing calculation rests on an inadequate evidentiary basis. *Span*, 170 F.3d at 803; *United States v. Acosta*, 85 F.3d 275, 283 (7th Cir.1996). The record before the court at sentencing must have been sufficient to support the drug quantity finding by a preponderance of the evidence.

*Hatchett*, 31 F.3d at 1418. On the other hand, if the district court's conclusion rests on reliable evidence in the record, we will not second-guess the way that the court weighed the evidence, nor will we upset its credibility determinations.

The district court assigned Pagan a base offense level of 38 based on its finding that his offenses involved 813.86 kilograms of cocaine, 1 ounce of heroin, and 515 pounds of marijuana. The court then added four levels based on its determination that Pagan played a leadership role in the offense, as provided by Guidelines § 3B1.1(a), for a total adjusted offense level of 42. This translated to a sentencing range of 360 months to life in prison. The court sentenced Herrera–Ruiz based on 812.16 kilograms of cocaine and 515 pounds of marijuana, resulting in a base offense level of 38. It then added three offense levels based on its finding that Herrera–Ruiz was a manager or supervisor in the offense, for a total adjusted offense level of 41 and a sentencing range of 324 to 405 months. Needless to say, the inclusion for relevant conduct purposes of the drugs found in the truck seized by the DEA in Texas had a profound impact on both sentences. In Herrera–Ruiz's case, for example, had those drugs not been included in his drug quantity calculation, he would have been sentenced according to an adjusted offense level of 28, yielding a sentencing range of 78 to 97 months.

▮ Even though Pagan may not have handled the Texas shipment personally, the evidence is strong that he actually knew about the shipment and that the delivery of the illegal cargo was in furtherance of his criminal enterprise. Pagan himself admitted he knew a truckload of drugs under the control of Quinones had been seized by the DEA. In addition, the government produced Aleman's testimony that the shipment was destined for Pagan's Auto Sales, the bank records indicating the checks in Quinones' name were being deposited in the dealership's bank account, aerial photographs showing

trucks similar to the one that was seized parked on the dealership's lot, and records showing that Pagan was the lienholder on several other trucks used by the Diaz brothers. In sum, we do not believe it was clear error to hold Pagan accountable for the seized drugs.

We cannot say the same for Herrera–Ruiz. The proportion of the total amount of drugs that passes through a conspiracy for which an individual member may be held responsible depends on what the individual could have foreseen based on his role in the conspiracy. *United States v. Willis*, 49 F.3d 1271, 1274 (7th Cir.1995). As the Guidelines explain, a street-level drug dealer generally will not be held accountable for quantities of drugs sold by other street-level dealers simply because both dealers are supplied by the same distributor. See U.S.S.G. § 1B1.3, Application Note 2, illus. (c)(6),(7); see also *Willis*, 49 F.3d at 1274. Instead, the government must show that the quantities handled by other dealers were in furtherance of the defendant's own criminal designs. In other words, the sentencing court must look at the scope of the conspiracy in which the defendant actually joined, which may not be coextensive with the overarching criminal enterprise. *Willis*, 49 F.3d at 1274.

In the government's view, Herrera–Ruiz was in fact a manager or supervisor of Pagan's larger operation and thus played a more significant role in the conspiracy than that of mere street-level dealer. But it has pointed to no evidence that would support a finding that Herrera–Ruiz had a stake in this conspiracy greater than his own role as an individual dealer. When questioned on this point both at sentencing and during oral argument before this court, the government repeatedly returned to its evidence connecting the shipment to Pagan and connecting Pagan to Herrera–Ruiz. This is not enough. There must have been some evidence to show that the shipment was within the scope of the agreement Herrera–Ruiz entered into.

Because we believe it was improper to hold Herrera–Ruiz accountable for the truckload of drugs, we must vacate Herrera–Ruiz's sentence and remand his case for re-sentencing.

### B. Enhancement for Aggravating Role

As we have noted, Herrera–Ruiz also received an enhancement for his aggravating role in the offense. Under the Guidelines, "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," his offense level should be increased by three. U.S.S.G. § 3B1.1(b). Herrera–Ruiz does not contest the district court's finding that the conspiracy included five or more participants, reserving his objections for its conclusion that he played a "managerial" role. We review this decision for clear error. *United States v. Jackson*, 935 F.2d 832, 847 (7th Cir.1991).

A defendant qualifies as an organizer, leader, manager, or supervisor of a conspiracy for the purposes of Guidelines § 3B1.1 when she has "had some real and direct influence" on other participants in the conspiracy. *United States v. Mankiewicz*, 122 F.3d 399, 405 (7th Cir.1997) quoting, *United States v. Mustread*, 42 F.3d 1097, 1103 (7th Cir.1994). The fact that a defendant was a distributor in a drug conspiracy, even a large distributor, is not enough to support a § 3B1.1 offense level increase. *Mustread*, 42 F.3d at 1104. Instead, the government must show that the defendant "exercised *some* control over others involved in the commission of the offense," *United States v. House*, 110 F.3d 1281, 1287 (7th Cir.), *cert. denied sub nom. Hughes v. United States*, 522 U.S. 877, 118 S.Ct. 199, 139 L.Ed.2d 136 (1997); see also *United States v. McGuire*, 957 F.2d 310, 316 (7th Cir.1992). Thus, we have held that the determination of a defendant's role in an offense should be made with an eye toward (1) the exercise of decision-making authority; (2) the nature

of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. *Mustread*, 42 F.3d at 1104.

■ As these factors illustrate, it hardly makes sense to brand a defendant a "manager" or "supervisor" unless there is some evidence that she "managed" or "supervised" some aspect of the criminal enterprise. At sentencing, the district judge specifically asked the government to point to evidence in the record showing Herrera–Ruiz's managerial role. The government's attorney responded that Herrera–Ruiz was a manager because (1) he sold large quantities of high-quality drugs, and (2) Pagan trusted him enough to allow him to deal directly from the auto dealership. He further explained that Herrera–Ruiz's co-defendant, Santiago, was not a manager because "[he] did not have a close managerial relationship with Miguel Pagan. [Herrera–Ruiz] did because he was allowed to purchase on his auto facility.... [Y]ou could characterize [Herrera–Ruiz] as one of the upper echelon members of Miguel Pagan's organization, because we didn't have anyone else at trial who purchased directly on the premises of Miguel Pagan's auto facility."

We find the government's rationale insufficient to support a finding that Herrera–Ruiz was a manager or supervisor for Pagan's drug operation. There is no evidence that Herrera–Ruiz directed the activities of anyone else connected with the conspiracy, recruited others into the conspiracy, or received a share of the conspiracy's proceeds beyond the profits from his own sales. The fact that Pagan may have "trusted" Herrera–Ruiz more than the other street-level dealers in his operation, standing alone, does not support the enhancement.

In sum, we Affirm the convictions of both Pagan and Herrera–Ruiz. We also Affirm the sentence imposed upon Pagan. Because the district court erred in calculating the quantity of drugs for which Herrera–Ruiz may be held accountable and in determining that he played a managerial role in the conspiracy, we Vacate his sentence and Remand for re-sentencing consistent with this opinion.