In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1719

United States of America,

Plaintiff-Appellee,

v.

Diego Albarran,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 371--James F. Holderman, Judge.

Argued November 3, 2000--Decided November 30, 2000

Before Flaum, Chief Judge, and Easterbrook and
Williams, Circuit Judges.

Flaum, Chief Judge.  Diego Albarran was convicted
of conspiracy to possess with intent to
distribute cocaine and possession with intent to
distribute cocaine. Albarran now appeals his
conviction, arguing: (1) there was insufficient
evidence to sustain his conviction for conspiracy
to possess with intent to distribute cocaine; (2)
the district court erred when it denied his
request for a downward departure based upon
diminished capacity at the time of the offense
and an extraordinary physical impairment; and (3)
the district court erred in its calculation of
the amount of drugs attributable to him for
sentencing purposes. For the reasons stated
herein, we affirm.

Background

On the afternoon of May 13, 1999 the Drug
Enforcement Administration ("DEA") was involved
in an undercover set-up operation. While
monitoring a series of telephone calls between a
confidential informant named Sean and Pedro Maya,
the DEA learned that Sean had agreed to purchase
"three or four, or maybe more" kilograms of
cocaine for $23,000 dollars each, per kilo, from
Maya. Sean wanted to see a sample of the cocaine
and so Maya accommodated Sean's request by
arranging a meeting between himself, his friend
who would be supplying the drugs, and Sean. Early
that same evening, Maya, his friend Raul

Navarrette, Sean, and Agent Roger Ehler met at the Round Table Restaurant on Clark Street in Chicago to discuss the cocaine deal. At around 6:45 p.m., Navarrette, Maya, and Sean got into Agent Ehler's car. Maya and Navarrette directed Agent Ehler to 1555 West Hollywood Avenue, where he parked his car across the street from the Hollywood apartment building.

Finally, Diego Albarran appeared on the scene when he walked out of the Hollywood building carrying a black backpack and got into the back seat of the agent's car with Navarrette and Maya. Navarrette took the backpack from Albarran, pulled out a rectangular package wrapped in plastic, and cut open the package which contained a kilogram of cocaine. During this entire process, Albarran remained seated next to Navarrette, who had in his possession the open kilogram of cocaine. Discussions then ensued between the agent and Navarrette concerning the price and quality of the cocaine. The undercover agent during these negotiations gave the prearranged arrest signal and DEA agents proceeded to arrest Maya, Navarrette, and Albarran.

There is evidence that Albarran's role in the drug deal was not limited to delivering the drugs to Navarrette and observing the deal unfold. Rather, his telephone records reveal that he received ten phone calls on May 13 from Ignacio Estrada, who also played a role in setting up the drug deal. At approximately 3:30 p.m. in the afternoon, when Sean and Maya decided to set up the cocaine transaction, Maya talked to Navarrette, who immediately spoke to Estrada. Within a few minutes of Estrada being contacted, he began calling Albarran. This led to Estrada and Albarran exchanging phone calls throughout the afternoon and evening. The telephone records show that Albarran called Estrada at 6:13 p.m. and 6:23 p.m., which is during the period when the final arrangements for the drug transaction were occurring at the Round Table Restaurant. As the deal itself was progressing at the restaurant, DEA surveillance agents were tracking the activities of Agent Ehler. While doing so, one of the agents at 6:45 p.m. first realized that Albarran was walking down Clark Street, away from the Round Table Restaurant. He noticed that Albarran was carrying a cell phone and was within the vicinity of where the drug negotiations were taking place.

Albarran's arrest resulted in the search of Apartment 114 at 1555 West Hollywood Avenue. The agents learned that one of Albarran's keys fit the lock to that apartment, and shortly thereafter, a search of Apartment 114 was

conducted. The apartment itself had an odor of marijuana. What was discovered in the apartment was more than marijuana. Agents uncovered in the apartment two kilograms of methamphetamine in various bags inside an open suitcase, five kilograms of cocaine scattered throughout the kitchen and alcove area, and a small amount of marijuana as well. The wholesale value of the drugs found in the apartment, according to an expert, was in excess of $150,000. During the search, the agents seized cutting and purifying tools used in the processing of drugs, sifters, strainers, and spoons covered with drug residue, two digital scales in plain view on the kitchen counter, and an assortment of packaging materials such as duct tape and plastic bags. In the middle of the apartment, agents also discovered a wooden press in a microwave oven sitting on a bed. The wooden press is used to form kilogram quantities of cocaine into bricks. Although the apartment had very few indications that it was being utilized as a living space, the agents did find a number of personal papers of Albarran's in the apartment, such as his passport, various personal records, a matchbook from the Round Table Restaurant, receipts dated in early May, a letter dated May 7, and a letter postmarked May 6 and addressed to Albarran at a different address. Albarran's fingerprints were detected on a small bag of cocaine in the apartment as well.

Albarran was charged with one count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. sec. 846, and one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. sec. 841(a)(1). Albarran's first trial ended in a mistrial because of concerns relating to his health. A retrial followed and the jury found Albarran guilty as charged on both counts and the district court sentenced him to 210 months of imprisonment.

Discussion

A.  Sufficiency of the Evidence

Albarran contends that the government failed to demonstrate that he knowingly agreed to distribute drugs, and furthermore, even if he was involved in some sort of conspiracy, the government never adequately proved that he knew of the illegal objective of the conspiracy. Sufficiency of evidence challenges are difficult to mount because the standard of review favors the government. We review a jury's determination for sufficiency of evidence in the light most favorable to the government and uphold a jury's decision if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia,

443 U.S. 307, 319 (1979). Albarran's sufficiency of evidence challenge is by no means doomed from the outset, but there is no question that he faces "'a heavy burden.'" United States v. Granados, 142 F.3d 1016, 1019 (7th Cir. 1998) (quoting United States v. Campbell, 985 F.2d 341, 344 (7th Cir. 1993)). We will therefore overturn a jury's verdict if the record contains no evidence, no matter how the evidence is weighed, from which the jury could have found guilt beyond a reasonable doubt. Id.

The government has the task of proving that Albarran was part of a conspiracy. To do so, the government must establish that a conspiracy existed and that Albarran knowingly agreed to join it. United States v. Pagan, 196 F.3d 884, 889 (7th Cir. 1999). Determining that a conspiracy exists is only the first step in the process, as it is incumbent upon the government to show that there is substantial evidence that the particular defendant in question "knew of the illegal objective of the conspiracy and agreed to participate in its achievement." United States v. Burrell, 963 F.2d 976, 987 (7th Cir. 1992). In building its case, the government need not rely exclusively upon direct evidence. The government can, if it so wishes, construct a conspiracy case solely upon circumstantial evidence. Pagan, 196 F.3d at 889.

Albarran contends that the government's case against him is based upon such weak circumstantial evidence that no jury could have reasonably concluded that he was part of a drug conspiracy. He contests the government's reliance upon phone calls placed between Estrada and himself because none of these phone calls were recorded. In addition, he argues that there were no phone calls between himself and Maya or Navarrette. Maya testified that prior to being arrested, he did not know Estrada or Albarran. There is no evidence, according to Albarran, that he personally had conversations with or knew of discussions among Estrada, Navarrette, or Maya. With respect to the period before the actual drug transaction, Albarran claims that although agents saw him talking on the phone and walking within the vicinity of the Round Table Restaurant, these facts fail to link him to the conspiracy. All the evidence that the government proffered to show that Albarran was involved in the planning stages of the drug transaction, like the phone calls he placed and received and his presence near the Round Table Restaurant, do not conclusively establish his direct participation in the drug conspiracy according to Albarran.

Albarran views his involvement in this entire situation as being the result of unlucky

circumstances. Because Albarran had lost his job, he had left his apartment and was living on the streets. A man named "El Panzon" offered to allow him to live in an apartment at 1555 West Hollywood Avenue until the security deposit ran out. About four days before his arrest, "El Panzon" gave Albarran the keys to the apartment. Albarran claims that two to three days prior to his arrest he cleaned the apartment and he never saw in the apartment drugs, bags filled with white or brown powder, scales, a block press, or tape at that time.

Albarran argues that he was present at the drug transaction on May 13, 1999 because he merely was trying to do "El Panzon" a favor. He simply picked up the bag and delivered it as he was told to Agent Ehler's truck because "El Panzon" had asked him to do so. Navarrette took the bag from Albarran and he was helped inside the truck because he was out of breath due to his heart condition. He then proceeded to rest inside the truck. He contends that he had no idea that the bag contained cocaine and he was not inside the Hollywood apartment prior to delivering the bag that day because he had been at the hospital and the taqueria and had slept elsewhere the night before. In addition, several people had access to the apartment and none of the alleged drug paraphernalia was in plain view except the wrappings inside the suitcase. Albarran claims that he had no role in negotiating or planning the drug transaction nor did he even have any idea that he was delivering drugs. He attempts to portray himself as a person in a desperate situation, who merely delivered the bag as a favor in an effort to repay "El Panzon" for his generosity. Albarran is therefore contending that he had neither the knowledge nor the desire to take part in the drug conspiracy and only happenstance caused him to be involved at all.

Unfortunately for Albarran, the jury did not believe his version of the facts. We accord a jury's determination in this type of case deference and we cannot take it upon ourselves, considering the circumstantial evidence presented by the government, to dislodge the conclusions of the jury. The government need not provide evidence of overt acts taken on the part of Albarran to advance the conspiracy, rather the government may show a "'participatory link'" between the conspiracy and the defendant. United States v. Hunte, 196 F.3d 687, 691 (7th Cir. 1999) (quoting United States v. Navarez, 954 F.2d 1375, 1380-81 (7th Cir. 1992)). According to the government, there was ample evidence connecting Albarran to the conspiracy, including: (1) Albarran's participation in a series of telephone calls leading up to the drug transaction; (2) his

presence near the Round Table Restaurant when the deal was being negotiated; (3) his full access to the apartment where the drugs were stored; and (4) his decision to deliver the cocaine to the car and remain in the car while the deal was being finalized.

Albarran denies knowing that the purpose of the conspiracy was drug related, but the government contends that this is an empty argument considering Apartment 114 was being used as a stash house. No one actually lived in the apartment; it was used to store, process, and prepare drugs for distribution. Albarran admitted while testifying that he had seen in the apartment the microwave on the bed, the cutting agents inside the kitchen cabinets, and the marijuana inside a kitchen drawer. Having seen these items alone, the government suggests, should have put Albarran on notice that the apartment was being utilized for drug processing. In addition, Albarran had a key to the apartment, which had in excess of $150,000 worth of drugs stored in it and he was given a bag that contained a kilogram of cocaine worth $23,000. When he got into the car with Maya, Navarrette, Sean, and the undercover agent, Albarran remained there while the cocaine was opened, displayed, and discussed. This tends to show that Albarran was viewed by the other men with some degree of trust during "critical junctures" of the drug transaction, which supports the view that he was part of the conspiracy. United States v. Theodosopoulos, 48 F.3d 1438, 1451 (7th Cir. 1995). Taken as a whole, the government argues that the circumstantial evidence provided clearly implicates Albarran as taking part in the drug conspiracy.

Albarran's sufficiency of evidence argument is a particularly weak one in light of the district court's commentary on the matter. The district court judge added two points to Albarran's sentence level for obstruction of justice under sec. 3C1.1 of the Sentencing Guidelines. U.S.S.G. sec. 3C1.1 (Nov. 1998). Specifically, the district court said, "I believe that Mr. Albarran did intentionally provide false testimony with regard to his knowledge and understanding of the contents of the backpack and the contents of the apartment. It was clear to me from observing his demeanor and listening to the other testimony in connection with the case that he was attempting to exonerate himself from a crime that he was engaged in and the jury ultimately found he was engaged in." The district court judge's determination further buttresses the jury's conclusion that Albarran was involved in a drug conspiracy and we will not overturn the jury's judgment, which was confirmed by the district

court. On this basis, we affirm the district court's determination that Albarran was involved in a drug conspiracy.

B.  Downward Departure Requests: Diminished Capacity and Extraordinary Physical Impairment

Albarran further objects to the district court's decision to deny him a downward departure based upon the ground that at the time he committed the offense he suffered from a diminished capacity and the court's conclusion that at the time of sentencing he was not suffering from an extraordinary physical impairment. The Sentencing Guidelines provide for a downward departure in the case of diminished capacity under sec. 5K2.13 if it is determined that the defendant "committed the offense while suffering from a significantly reduced mental capacity." U.S.S.G. sec. 5K2.13 (Nov. 1998). Similarly, the Sentencing Guidelines have a provision that does allow for a departure when it is determined that "an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." U.S.S.G. sec. 5H1.4 (Nov. 1998). Albarran can successfully challenge the district court's departure decisions if he shows that the district court "misunderstood or misapplied the law, because when a district court recognizes its authority to depart under the guidelines but in an exercise of its discretion chooses not to do so, an appellate court lacks jurisdiction to review that decision." United States v. Thomas, 181 F.3d 870, 873 (7th Cir. 1999).

Albarran contends that the district court did in fact misunderstand the law with regard to his departure requests. During the sentencing hearing, the district court made mention of Albarran's "heart condition at the time of the offense" and talked about how Albarran was not "under an extraordinary physical impairment at the time of the offense." These two references are troublesome according to Albarran because U.S.S.G. sec. 5H1.4 does not mention that the defendant must have suffered an extraordinary physical impairment at the time of the offense. The district court addressed the extraordinary physical impairment request and the diminished capacity request at the same time, and Albarran believes that the district court conflated the two issues.

Albarran argues that because the district court applied an improper legal standard to his extraordinary physical impairment motion, the

court as a result ignored the obvious health problems that he displayed. For instance, during his first trial he collapsed in the courtroom and eventually a mistrial was declared because he was unable to attend court due to his ill health. Thereafter, he was sent to Rochester, Minnesota to be evaluated and the district court had a hearing on the status of Albarran's health. Dr. Javid testified that Albarran suffered from cardiomyopathy and an enlarged heart. During his trial, the court heard testimony concerning Albarran's hospitalizations and his medical condition. Albarran during sentencing had difficulty recalling the presentence investigation report and the basic legal evolution of his case. All of this evidence regarding his physical condition, Albarran believes, should have been examined by the district court in relation to his extraordinary physical impairment departure request.

Albarran's position is not persuasive. He provided the district court with a memorandum discussing his diminished capacity at the time of his offense and in a separate part of the submission he addressed his extraordinary physical impairment claim. The government responded to Albarran's memorandum by pointing out that the district court had previously determined that a jury instruction regarding Albarran's diminished capacity at the time of offense would be inappropriate because there was insufficient evidence presented to warrant such an instruction. In relation to the physical impairment argument, the government noted that case law requires that the defendant prove that he has certain medical needs that could not be met if he was confined and Albarran never specifically provided evidence that the Bureau of Prisons could not adequately treat his physical impairments.

At the sentencing hearing, the court reached the two departure issues and allowed the defendant's counsel the opportunity to address the diminished capacity and the extraordinary physical impairment departure motions. Albarran's counsel took this opportunity to discuss Albarran's diminished capacity and the government responded in kind. At no point during this part of the hearing, did Albarran's counsel present evidence regarding why his physical condition would preclude him from being incarcerated and cared for properly by the Bureau of Prisons. The district court when considering a departure based upon a physical impairment "must ascertain, through competent medical testimony, that the defendant needs constant medical care, or that the care he does need will not be available to him should he be incarcerated." United States v.

Sherman, 53 F.3d 782, 787 (7th Cir. 1995). There was no independent evidence presented concerning Albarran's medical condition at the sentencing hearing, therefore it would have been inappropriate for the district court to grant a departure on this basis.

Albarran's contention that the district court did not understand its legal obligations with regard to his departure requests is a failing argument. It may appear as though the district court conflated to some extent Albarran's diminished capacity and extraordinary physical impairment departure motions, but even if we were to assume that this were true, this type of confusion on the district court's part does not necessarily indicate that the court did not understand its authority to depart. When the district court judge began to address the issue, he remarked, "I don't believe that's sufficient to support a downward departure for diminished capacity or extraordinary physical impairment." He clearly had acknowledged the distinct nature of the two departure requests and perhaps began to discuss the two together because they were both based upon Albarran's heart condition. Most of his commentary centers around the significance of Albarran's heart condition as seen by the district court's admonishment that "[p]eople have heart conditions across this country and continue to engage in normal conduct and have at least sufficient ability to conduct their affairs in an appropriate manner that comports with the law. I believe that the diminished capacity/extraordinary physical impairment departure downward would be inappropriate." We simply have no indication that the district court did not understand its discretion and we are inclined to presume that the opposite is true: "'[A] claim that a seasoned judge . . . didn't understand his discretion will rarely, if ever, be successful when built merely on inference. Article III judges are presumed to know the law . . . .'" United States v. Wilson, 134 F.3d 855, 869 (7th Cir. 1998) (quoting United States v. Kezerle, 99 F.3d 867, 870 (7th Cir. 1996)) (alterations in original). This is not one of those rare situations where we would be compelled to determine that the district court did not understand its discretion. Consequently, we lack jurisdiction to review the court's departure decisions and we reject Albarran's arguments concerning this aspect of his sentence. We therefore affirm the district court's decision not to depart downward with regard to the diminished capacity and extraordinary physical impairment motions.

C.  Quantity of Drugs Challenge

We now reach Albarran's last challenge. He

contends that the district court improperly included in determining his offense level under the Sentencing Guidelines the drugs discovered in Apartment 114 on 1555 West Hollywood Avenue. The district court's decision regarding the quantity of drugs that Albarran is responsible for is a finding of fact that we review for clear error. Pagan, 196 F.3d at 891. One can prove clear error if the "sentencing calculation rests on an inadequate evidentiary basis." Id. The record before the court must be sufficient in nature at sentencing to support a finding by a preponderance of the evidence. Id. Therefore, "if the district court's conclusion rests on reliable evidence in the record, we will not second-guess the way that the court weighed the evidence, nor will we upset its credibility determinations." Id. We will overturn a factual determination if we are left "with the definite and firm conviction that a mistake has been committed." United States v. Garcia, 69 F.3d 810, 819 (7th Cir. 1995) (citations and internal quotation marks omitted).

Albarran is contesting the district court's decision to attribute the drugs found in Apartment 114 to him as part and parcel of his involvement with the greater drug conspiracy. Although this argument rests upon the notion that such drugs were not a reasonably foreseeable part of the alleged conspiracy that Albarran agreed to partake in, we are really dealing with yet another sufficiency of evidence question that rehashes several of the facts and arguments raised before. As a co-conspirator, a defendant can be held accountable for transactions in which he or she did not personally participate if such a deal was reasonably foreseeable to him or her. United States v. Pigee, 197 F.3d 879, 889-90 (7th Cir. 1999). The Sentencing Guidelines state that one's offense level can be based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. sec. 1B1.3(a)(1)(B) (Nov. 1998). Comment 2 to U.S.S.G. sec. 1B1.3 notes that a defendant "in the case of a jointly undertaken criminal activity, [is accountable for] all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." Albarran claims that even if he was involved in delivering one kilogram of cocaine, the drugs found in the apartment were not within the scope of the agreement that he allegedly entered into with the other defendants in this case.

Albarran once again challenges the circumstantial evidence presented by the government that connects him to the drugs found in the apartment. He argues that several people

had access to Apartment 114, and other than the suitcase that had within it a brown substance, none of the other drugs discovered in the apartment were in plain view. Also, there is no evidence as to when the suitcase was brought into the apartment and Albarran reminds us that his fingerprints were not found on the suitcase. More importantly, according to Albarran, there is no evidence that he was inside the apartment on May 12, 1999 until he was arrested. On the morning of his arrest, Albarran went to the hospital and arrived back at his apartment right before his arrest. Furthermore, Albarran points out that Agent Stanley M. Grobe testified that a stash house is utilized for a limited period of time. Grobe said that the processing of a kilo can be done in a matter of hours and generally the people who touch the wooden press are mainly responsible for the processing of the cocaine. In this case, Albarran's fingerprints were not on the microwave, block press, or cutting agents and Albarran believes this indicates that he did not participate in processing the drugs discovered in the apartment. According to Albarran, although the drugs were recovered from the apartment, there is no evidence that he negotiated for this particular amount of drugs, that he expected to profit from them, and he was not considered to be a leader or organizer in the drug processing. From Albarran's perspective, there is a lack of evidence connecting him with the scheme of selling the drugs found in Apartment 114.

It is difficult to reconcile Albarran's theory of what transpired at the apartment with the district court's conclusions regarding this matter. First, it does not aid Albarran's case that the district court found that he had provided false testimony concerning his knowledge of what was located within Apartment 114. Second, the district court judge did entertain commentary about the drugs found within the apartment and how this would affect Albarran's offense level. After listening to arguments from both sides, the district court did concede that the evidence connecting Albarran to the drugs in the apartment was circumstantial,

but the evidence is very strong from the standpoint of it being circumstantial evidence. I won't reiterate it all, but the fact that Mr. Albarran had a key, the fact that Mr. Albarran had clothing and other items in the apartment, the fact that Mr. Albarran had admitted on the witness stand that he did see [a] microwave on the bed, [which] could be construed as drug paraphernalia, indicates to me that this was not a situation where someone unbeknownst to Mr. Albarran brought in the drugs that very day in Mr. Albarran's absence and then involved Mr.

Albarran in the criminal activity, keeping Mr. Albarran in the dark about the circumstances of that drug activity or the extent of it.

The circumstantial evidence, as illustrated from the district court's comments, sufficiently proved that Albarran knew of the drugs found in the apartment and that he was not an innocent person who was wrongfully caught up in the situation. The district court did not commit clear error when it included the drugs discovered in the apartment in its calculation of Albarran's offense level and therefore we affirm its determination regarding the drug quantity in Albarran's case.

Conclusion

For the reasons stated herein, we AFFIRM the decision of the district court.