In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2647

United States of America,

Plaintiff-Appellee,

v.

Sergio Estrada,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 46--Suzanne B. Conlon, Judge.

Argued March 30, 2001--Decided June 22, 2001


   Before Flaum, Chief Judge, and Posner and
Evans, Circuit Judges.

   Flaum, Chief Judge.  Sergio Estrada was
convicted of knowingly and intentionally
attempting to possess with the intent to
distribute mixtures containing cocaine.
Estrada now appeals his conviction,
arguing that: (1) the government engaged
in outrageous conduct through its
arrangement with informant Jose Antonio
Varela; (2) the district court erred when
it allowed the government to introduce
into evidence translated transcripts of
Spanish conversations without ever
playing the tapes of those conversations;
and (3) he was the victim of sentencing
entrapment. For the reasons stated
herein, we affirm.

Background

   Sergio Estrada's current legal problems
arise out of his coming into contact with
Jose Antonio Varela ("Varela").
Unbeknownst to Estrada, Varela worked as
a confidential informant for the Drug
Enforcement Agency ("DEA"). On January
13, 2000, a woman named Deysi who worked
at the Sin Frontera bar, introduced
Estrada to Varela. Estrada discussed with
Varela the possibility of purchasing
cocaine from him. Varela said a kilogram
of cocaine would cost Estrada $17,000,
but if he purchased more than five
kilograms, then the price per kilogram

would be reduced to $16,000. Although Estrada desired to buy a kilogram that night, Varela would not accommodate this request. When the two ended their conversation, they exchanged phone numbers. On January 14, Varela spoke with Estrada and told him that he really needed the cocaine right away. Varela, however, was going to be in California and could not supply Estrada with cocaine until he returned. Once again, on January 17, Estrada and Varela spoke and they arranged to meet the next day. Estrada on January 18, accompanied by his brother Otoniel Estrada, who was going to supply the money for the cocaine, met Varela in the parking lot of the Hillside Holiday Inn to inspect the cocaine. Also present was Richard Alvarado, a police officer working undercover and posing as Varela's partner. Otoniel Estrada inspected the cocaine and determined that it was fine. Despite Estrada's desire to go ahead with the deal that day, it was decided that the transaction would be completed the next day. Varela spoke with Estrada on the phone after the meeting at the Hillside Holiday Inn and it was agreed that Estrada would purchase five kilograms of cocaine and take two kilograms on credit. As Estrada arrived in the parking lot of the Hillside Holiday Inn on January 19, undercover officer Alvarado met him and entered Estrada's car. Estrada showed Alvarado a large amount of cash that he was carrying in a fanny pack strapped to his waist, which contained approximately $35,000. After a brief exchange, Alvarado gave a signal and DEA agents arrested Estrada. After the arrest of Estrada, agents recovered an additional $25,000 from a Jeep parked in back of Estrada's car.

Estrada was charged with one count of knowingly and intentionally attempting to possess with the intent to distribute approximately 7 kilograms of mixtures containing cocaine in violation of 21 U.S.C. sec. 846. On May 3, Estrada was convicted by a jury and the district court sentenced him to serve 121 months of imprisonment.

Discussion

I. Outrageous Government Conduct

Estrada contends that the government's employment of Varela as a contingent fee

informant constituted outrageous conduct in violation of the Due Process Clause. The origins of the outrageous conduct doctrine can be traced to United States v. Russell, 411 U.S. 423 (1973), in which the Supreme Court stated that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . ." Id. at 431-32; see also United States v. Miller, 891 F.2d 1265, 1267 (7th Cir. 1989). According to Estrada, the DEA acted in an outrageous manner through the particular type of confidential informant arrangement it had with Varela. Between 1987 and 1991 Varela sold approximately three to four hundred kilograms of cocaine. To avoid a possible life sentence after his arrest in 1991, Varela agreed to become a confidential informant. The government has paid Varela more than $400,000 for his services. He has purchased two homes with this money, one of which is in Honduras.

Estrada claims that several aspects of Varela's involvement in procuring his arrest raise questions about the government's behavior. To begin with, Varela testified that he receives 25 percent of whatever money the DEA seizes during a sting. Estrada argues that such a compensation arrangement is contrary to the agency's alleged goal of reducing the supply of narcotics. Estrada contends that Varela had total discretion to select his target, and as a consequence, he selects a target based upon the amount of money that he believes can be seized from that person. Accordingly, Estrada advances that when Varela decides to select a particular target, he does not take into account the more traditional law enforcement factors, like a target's prior criminal history. Estrada asserts this is evidenced by the fact he had no history of drug trafficking or othercriminal activity. He believes that Varela targeted him because he knew that Estrada worked as a cook at the restaurant that his brother owned and so Varela determined that Estrada's brother would be able to raise the cash necessary for the deal, thus ensuring that he would receive 25 percent of the cash seized. Estrada suggests that not only was Varela allowed to select his targets, but he

also was authorized to assume the lead role of seller in the sting operation. According to Estrada, typically informants are used to introduce the target to an undercover agent who then assumes control of the transaction and ensures that the deal furthers legitimate law enforcement concerns. In this particular case, Estrada argues that Varela was given complete discretion to negotiate the deal to serve his own interests, which was to induce him to agree to a purchase that involved the greatest amount of cash so that he maximized his commission. Estrada warns that one must remember that Varela was given such extensive discretion even after he failed a polygraph examination just three months before he targeted Estrada. Further, Varela's discretion was not limited to selection of a target. Estrada claims that Varela had complete control over what conversations he chose to tape record when dealing with him and so he was able to limit the amount of exculpatory evidence available after the sting operation; thus, ensuring that the government would be able to successfully prosecute Estrada and that Varela would receive his commission.

Estrada finally notes that Varela's involvement with his case did not end when he was arrested. During the trial, Estrada argues that Varela was the star prosecution witness despite the fact Varela had a history of deception and incentive to perjure himself to assure a conviction and his own commission. In support of this position, Estrada points out that Judge Wiggins in United States v. Cuellar, 96 F.3d 1179, 1189 (9th Cir. 1996) (concurring) said that certain factors, not present in that case, should be given consideration when attempting to assess whether the government has engaged in outrageous conduct in violation of an individual's due process rights. Estrada asserts that those factors are present in this case, including that: (1) Varela was "instrumental" in building the case against him; and (2) Varela was given discretion to develop the case against him. Id. Estrada thus argues that when one considers Varela's arrangement with the DEA in its totality, it becomes clear that the government acted in an outrageous manner.

The government contends that Estrada's

claim of outrageous government conduct cannot be sustained in light of this Circuit's refusal to recognize the existence of such a doctrine. In United States v. Boyd, 55 F.3d 239 (7th Cir. 1995), the doctrine was specifically disavowed: "Today we let the other shoe drop, and hold that the doctrine [of outrageous governmental misconduct] does not exist in this circuit. The gravity of the prosecutors' misconduct is relevant only insofar as it may shed light on the materiality of the infringement of the defendants' rights; it may support, but it can never compel, an inference that the prosecutors resorted to improper tactics because they were justifiably fearful that without such tactics the defendants might be acquitted." Id. at 241. The government claims that Estrada's outrageous conduct argument has been foreclosed by this Circuit's case law.

During oral argument, we opined that in some situations the government uses either money or promises of lenience to induce testimony, which is commonplace and permitted. Varela's arrangement does not seem to quite fit within the aforementioned scenario. Varela was paid prior to testifying at Estrada's trial $1000 and at the time of the trial he was still expecting to receive 25 percent of the cash seized from the sting operation. This type of arrangement we suggested at argument can appear to make the witness's compensation uniquely dependent on the outcome of the case. Apparently, if Varela testified truthfully, but Estrada was not convicted, he would not receive 25 percent of the money seized, which amounted to $15,000 or $20,000./1 While Estrada has framed the issue as one of outrageous government conduct, what appears to be his true concern is the admission of Varela's testimony during his trial.

Varela during the trial stated that he was involved in about 60 to 70 investigations and that he testified in about 10 to 13 trials. He claims to not have figured out how the DEA pays him, yet he acknowledged that since 1996 he has had an agreement with the DEA providing that they would pay him 25 percent of the cash seized during an operation. Although Varela said he expected 25 percent of the money seized from the Estrada sting, he contended that

he was not sure how much money was confiscated during the investigation. Further, Varela was unsure about when he would be paid the 25 percent, except that he believed it took up to six months and perhaps even longer. When questioned about whether he had to testify to get paid, his response was "[w]ell, because I never known it like that, that they pay me to testify. I just know they only pay me 25 percent." Just prior to making this remark, Varela in response to a question asking whether he must testify and follow through with a case, said "Well, whatever--whatever I have to do." It is apparent from Varela's testimony that he was somewhat unclear about the conditions of his arrangement with the DEA. He was, however, definitive about his desire to receive 25 percent of the cash seized from the Estrada investigation. It is understandable that this was of concern to Varela, as it represented a significant, depending on the case, source of income for him.

Varela testified that he had received only $1000 before Estrada's trial and had yet to receive his 25 percent commission. During the trial, the district court instructed the jury in the following manner with regard to Varela's testimony, and in doing so framed the issue as one of credibility: "You have heard testimony from Jose Antonio Varela who received benefits from the government in connection with this case, namely received money and the promise of additional commission payments. You may give his testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care." We have stated that "[t]reating fee arrangements with witness/informants as a credibility factor for the jury rather than an outrageous conduct issue appears to be a more reasoned approach." United States v. Valona, 834 F.2d 1334, 1344 (7th Cir. 1987); see also United States v. Febus, 218 F.3d 784, 796 (7th Cir. 2000) ("And even in cases where the government pays informants for their testimony, we have held that such arrangements are not per se outrageous; rather the jury may consider [them] as evidence relating to the informant's credibility.") (internal citations and quotation marks omitted). It appears then that our general position with regard to admission of testimony of an informant

who has a contingent fee arrangement with government is to allow the jury to consider such an arrangement in its evaluation of a witness's credibility. While this may be our ususal approach, this case causes us to inquire whether Varela's testimony should simply be an issue of credibility for the jury to determine. For instance, when an informant is being paid living expenses, then the informant's testimony raises traditional credibility issues. Varela was not merely being paid a stipend that covered his living expenses.

Instead, the instruction underscores what promotes unease about the arrangement in this case, which is that Varela's fee arrangement was dependent, in part, on the conviction of Estrada. The First Circuit has remarked that "[c]ourts have generally allowed paid informants to testify as long as the agreements are not contingent upon the conviction of particular persons." United States v. Palow, 777 F.2d 52, 54 (1st Cir. 1985); United States v. Cresta, 825 F.2d 538, 547 (1st Cir. 1987) (same). The arrangement between Varela and the DEA indicates that the conviction of Estrada and Varela's payment were interdependent. To begin with, not only did Varela testify, he was the main witness at trial. He targeted Estrada, set up and negotiated the deal, and tape recorded certain conversations between himself and Estrada. Varela was to receive the bulk of his payment ($15,000 or $20,000) after he testified; leading us to conclude that in order for him to receive his 25 percent commission it was necessary that his testimony result in Estrada's conviction. See Cresta, 825 F.2d at 547 ("Montaner received the bulk of his compensation prior to trial; thus payment of this sum was not contingent upon the conviction of any of the defendants."); Valona, 834 F.2d at 1344 ("In addition, Rapkin received his fee well before trial and it was not in any way contingent upon the trial outcome."); United States v. Innamorati, 996 F.2d 456, 482 (1st Cir. 1993) ("Finally, the $250,000 payment to Scott was completed several days prior to trial, and the payment was thus not directly dependent upon the result of Scott's testimony in court."). As discussed earlier, Varela's arrangement with the DEA was ill-defined. Such lack of clarity and detail can only further be

construed to suggest that Varela's contingent fee was dependent on the outcome of the case. See United States v. Dailey, 759 F.2d 192, 200-201 (1st Cir. 1985) (discussing the benefits of a clear agreement between the government and a contingent witness in the context of plea agreements). Finally, it is important to remember that Varela had incentive to ensure that his testimony resulted in the conviction of Estrada, both from a monetary standpoint, and because he presumably wanted to show that he still could remain an important asset to the DEA in light of his credibility being called into question before Estrada's case. Three months prior to the beginning of the Estrada investigation, Varela had failed a lie detector test, so his veracity was in doubt, and therefore presumably so was his position with the DEA. As Varela himself admitted, he was not under contract with the DEA, so the DEA could at any point determine that it no longer required his assistance. Further, Varela's sole source of income was from being an informant, and he acted in this capacity primarily for the DEA.

At base, the government's arrangement with Varela can be characterized as a problematic means of pursuing a drug case. During all of the critical junctures of the case, from the initial investigatory stage, up to and through the period in which Varela testified, he was motivated to convict Estrada so that he would receive the much sought after and elusive 25 percent commission. Such an incentive structure does little to enhance overall confidence in the criminal justice system. Notwithstanding, as will be seen in Section III, there is such overwhelming evidence of Estrada's drug involvement that we conclude his sentence does not carry with it the specter of a miscarriage of justice.

II.  Admission of Translated Tape-Recorded Conversations

The government recorded several conversations between Estrada, his brother, and Varela. All of these conversations took place in Spanish. Prior to trial, the government prepared transcripts of English translations of these tapes. However, at trial, the government did not play any of the tapes. Estrada argues that the district court

abused its discretion when it allowed the introduction of the English translations as substantive evidence.

Estrada concedes that the jury was properly instructed that "[w]hether a transcript is an accurate translation, in whole or in part, is for you to decide." Estrada nonetheless advances that this instruction was rendered meaningless because the tapes were not played. During the trial, Estrada believes the crucial issue was his intent to purchase cocaine from Varela. Accordingly, it is Estrada's contention that the tapes became the most critical item of evidence to show his lack of intent. The jury heard only Varela's version of what was on the tapes because Estrada did not testify. Estrada claims that if the government had been required to play the tapes, then the jury would have had the opportunity to evaluate whether Varela's version of what transpired was credible. According to Estrada, allowing the tapes to be played would have given the jurors an opportunity to make judgments about the transcripts. From Estrada's perspective, even jurors with no knowledge of the Spanish language would have been able to judge the speaker's particular tone and inflection, such as whether the speaker was joking or serious and sincere or deceitful. Estrada therefore asserts that the tapes should have been played for the jury.

The district court's refusal to allow the Spanish tapes to be played was not an abuse of discretion. Although Estrada argued that the "transcript is merely an impression or an aid to the tape itself," the district court responded, "It's more than an aid in this case because it's a translation from another language." To which Estrada countered by remarking that "I know that, but the tape has to be in evidence for it to be an aid to the translation, because, clearly, the jury has to have the right to go back to the original evidence." The district court dismissed this point on the practical grounds that "[w]ell, they can't. It's in Spanish." From this exchange, it becomes apparent that the district court saw no value in allowing a presumably English-speaking jury to hear tapes that were recorded in Spanish. It is difficult to second-guess such a decision. Understandably, the district court may

have doubted whether a jury not proficient in Spanish would be able to properly comprehend from the tapes an individual's tone or inflection. See United States v. Grajales-Montoya, 117 F.3d 356, 367 (8th Cir. 1997) ("[T]he trial court denied the request [to admit certain tape-recorded conversations in Spanish], citing the unlikelihood that a listener who was not proficient in Spanish (such as a jury member) would be able to discern relevant inflections and idiosyncrasies (the trial court's word) without knowing the language being spoken. Mr. Montoya has suggested no reliable means of enabling people who do not speak Spanish to interpret inflections and tone, and we cannot think of any, either."). We find therefore that the district court did not abuse its discretion when it did not admit and play the Spanish tapes before the jury.

III.  Sentencing Entrapment

   We now reach Estrada's last challenge. Estrada contends that the district court improperly determined that he was responsible for five to fifteen kilograms of cocaine because the court did not make any findings that Estrada was predisposed to buy said quantity. The district court made the following remarks on the matter: "Well, I find that based on the trial testimony, that the use of a base offense level of a 32 is appropriate. That base offense level incorporates an amount from 5 kilograms to 15 kilograms. So I think it's sustained by a preponderance of the evidence. So that objection is overruled." The district court apparently determined that Estrada's behavior caused him to fall within sec. 2D1.1 (c)(4) of the Sentencing Guidelines, which provides for a base level offense of 32 for "[a]t least 5KG but less than 15 KG of Cocaine." The district court's decision regarding the quantity of drugs that Estrada is responsible for is a finding of fact that we review for clear error. United States v. Pagan, 196 F.3d 884, 891 (7th Cir. 1999). One can prove clear error if the "sentencing calculation rests on an inadequate evidentiary basis." Id. The record before the court must be sufficient in nature at sentencing to support a finding by a preponderance of the evidence. Id. Therefore, "if the district court's conclusion rests on reliable evidence in

the record, we will not second-guess the way that the court weighed the evidence, nor will we upset its credibility determinations." Id. We will overturn a factual determination if we are left "with the definite and firm conviction that a mistake has been committed." United States v. Garcia, 69 F.3d 810, 819 (7th Cir. 1995) (internal citations and quotation marks omitted).

Estrada maintains that the record shows that he was predisposed to purchase a much smaller quantity of cocaine and that Varela used bargain basement pricing and generous credit terms to induce him to agree to accept delivery of a larger quantity of cocaine. Consequently, Estrada argues that he was the victim of sentencing entrapment "which occurs when the government causes a defendant initially predisposed to commit a lesser crime to commit a more serious offense." United States v. Garcia, 79 F.3d 74, 75 (7th Cir. 1996). According to Estrada, the Sentencing Guidelines recognizes sentencing entrapment as a possible basis for a downward departure. See United States v. Searcy, 233 F.3d 1096, 1099 (8th Cir. 2000). One Circuit has remarked that "Application Notes 12 and 15, require the district court to determine whether sentencing entrapment has occurred. See U.S.S.G. sec. 2D1.1, comment. (nn.12, 15)."/2 Id. Estrada would like us to adopt the aforementioned position. Further, Estrada points out that we have stated that even though "Note [12] does not refer explicitly to reverse-buy situations, we have recognized that it theoretically has applicability to defendants caught in such a sting." United States v. Cotts, 14 F.3d 300, 307 (7th Cir. 1994). Estrada urges that it is important when addressing a sentencing entrapment issue to focus on the defendant's predisposition to commit the crime. See Searcy, 233 F.3d at 1099.

Estrada holds steadfast to the notion that he was not predisposed to engage in a five kilogram cocaine transaction. Estrada stresses that he has no prior convictions or arrests and worked as a cook at his brother's restaurant. Accordingly, Estrada believes that Varela targeted him because his brother owned a restaurant and had the ability to raise the cash necessary for the cocaine

transaction. In essence, Estrada is contending that his background belies the suggestion that he was predisposed to deal in cocaine at all, let alone five kilograms.

Estrada argues that the record shows that he had neither the intent nor the resources to engage in a five kilogram cocaine transaction. According to Estrada, Varela admitted that he and his brother initially only wanted to buy one kilogram of cocaine, but Varela refused to sell them such a small quantity. Further, Estrada contends that the transcripts of the tape-recorded conversations reveal that he and his brother asked Varela to arrange a smaller deal for one or two kilograms of cocaine. Varela's apparent response was that he did not want to waste his time arranging a deal for one or two kilograms. According to Estrada, his brother, who was going to supply the money for the deal, asked Varela to sell a smaller quantity of cocaine to them, and Varela said, "with two I can't," and proceeded to explain to Estrada's brother that the price would rise from $16,000 per kilogram to $18,000 or $19,000 per kilogram if he bought only one or two kilograms of cocaine. All of these exchanges, Estrada argues, demonstrate that he wanted to purchase only one or two kilograms from Varela; nevertheless, he decided to purchase more because Varela resisted going through with a deal that was of a smaller magnitude.

Estrada believes that DEA Agent Stanley M. Grobe's testimony regarding drug trafficking bolsters his position. Grobe testified that the wholesale price of cocaine in Chicago around January of 2000 was about $18,000 per kilogram and that $16,000 would be a "rock bottom" price. Further, Estrada maintains that Grobe testified that a first time buyer would pay full price and would not receive any cocaine on credit. Therefore, Estrada argues that Varela agreed to sell him five kilograms at the below wholesale price of $16,000 per kilogram and to give him two extra kilograms on credit in hopes of inducing him to accept a larger quantity of cocaine.

Finally, Estrada claims that it is clear that he lacked the predisposition to engage in a five kilogram transaction

because he had only $35,000 with him at the time of his arrest. Accordingly, Estrada claims that this suggests that he hoped that at the time of delivery, he would be able to persuade Varela to agree to a smaller deal for one or two kilograms. In addition, even if one considers the cash ($25,000) possessed by Estrada's brother in a separate vehicle, Estrada would have had only enough cash ($60,000 in total) to buy 3.75 kilograms at the $16,000 price and perhaps even less if Varela had decided to raise the price because the deal was going to be for a smaller amount. Estrada also points out that Agent Alvarado said that if the Estrada-Varela arrangement had been a real cocaine deal, it would not have taken place because the buyer did not bring enough money for the transaction.

Despite Estrada's claim that he was a victim of entrapment, we find this argument to be a failing one. In an entrapment situation, a person's lack of predisposition is the critical issue. See United States v. Theodosopoulos, 48 F.3d 1438, 1444 (7th Cir. 1995) ("The lack of predisposition is the principal element in the entrapment defense."). "Predisposition is not a purely mental state, the state of being willing to swallow the government's bait." United States v. Hollingsworth, 27 F.3d 1196, 1200 (7th Cir. 1994) (en banc). There is a positional aspect that should be taken into account along with the dispositional considerations. For instance, "[a] public official is in a position to take bribes; a drug addict to deal drugs; a gun dealer to engage in illegal gun sales." Id. As a consequence, "For these and other traditional targets of stings all that must be shown to establish predisposition and thus defeat the defense of entrapment is willingness to violate the law without extraordinary inducements; ability can be presumed." Id. While it may be true that certain Circuits, see Searcy, 233 F.3d at 1099 and United States v. Naranjo, 52 F.3d 245, 250 (9th Cir. 1995), recognize that Application Notes 12 and 15 address the issue of sentencing entrapment, the Seventh Circuit has not to date adopted this position. However, we need not resolve this issue to address Estrada's contention because as it will soon become clear, Estrada possessed the necessary predisposition to commit the crime in question, thus he has not successfully

established his entrapment defense.

Estrada was in a position to become involved in the purchase of drugs and willingly acted upon his desire to do so. One must remember that Varela spoke with Deysi, a woman who worked at the Sin Frontera bar, and she put Varela in contact with Estrada. When Estrada arrived at the bar, he and Varela began "talking about cocaine." It is rather clear that Deysi was aware that Estrada desired a source to supply him with drugs, and had it not been Varela (the government) who had done so, it would have been some other dealer. See Hollingsworth, 27 F.3d at 1200 ("It is different when the defendant is not in a position without the government's help to become involved in illegal activity."). Estrada was also rather eager to obtain the cocaine, indicating his willingness to violate the law. For example, Estrada asked Varela to "give him one [kilogram of cocaine] right away." Even though Varela had told Estrada he would be out of town and could not supply him with the one kilogram the very same day of their initial meeting, according to Varela, during a phone conversation the next day, Estrada said that he "needed it [cocaine] very badly." Later in that conversation with Varela, Estrada said, "[W]ell it's urgent for me like right now." Estrada asked Varela to proceed with the deal right away after his brother inspected the cocaine on January 18, but Varela refused. Estrada was intent upon purchasing cocaine from Varela and he wanted the deal to proceed quickly.

Estrada agreed to buy five kilograms and take two more kilograms on credit and he did so under no duress. At one point during the conversations between Estrada and Varela, Estrada asked, "What do you think, if, if I go for, for two, but bring me five. I have here, I'll bring you for two . . . ." Later on Estrada told Varela, "I, right now I have the five sold." Shortly thereafter, he told Varela, "Ok, I'll go for the five, and you'll give the two on credit?," to which Varela said, "Fine, Sergio." It appears that Estrada needed to receive five kilograms of cocaine from Varela because he already had sold this amount to an individual or several people. Varela never pressured Estrada to go through with the deal. In fact, when Estrada told

Varela that he did not want the deal to take place in Hillside because he was scared to go there with all the money necessary to purchase the cocaine, Varela told him, "Look, if you don't want to, there's no problem, Sergio. For me, there's no problem, Sergio . . . and we'll remain friends, you know." However, Estrada did agree to go through with the deal in Hillside and on the morning of January 19, the day the deal was to take place, Estrada asked Varela, "But they're going to be seven, right? And five?" Estrada was fixated upon Varela providing him with five kilograms of cocaine.

Although Estrada would like us to accept that he only had enough money ($60,000 if one includes the $25,000 found in the vehicle) at the most to purchase 3.75 kilograms of cocaine, this story is not convincing. From the beginning, Estrada was anxious to buy cocaine from Varela. Throughout the negotiation period, Estrada remained focused on obtaining five kilograms of cocaine and for good reason because he had sold this amount to someone else. Therefore, it is more than likely that Estrada arrived at Hillside with the intention of paying Varela for approximately 3 kilograms of cocaine and obtaining the other two kilograms. This would ensure that he would have the requisite amount he needed for resale. Varela could have charged Estrada the higher price of $19,000 per kilogram and Estrada would have had enough money to purchase 3 kilograms (total costing $57,000) and still receive two kilograms on credit. Unquestionably, Estrada was predisposed to purchasing the cocaine and more than capable of buying at least 5 kilograms. See Cotts, 14 F.3d at 306 n.2 ("He does not argue that he lacked a predisposition to buy multiple kilogram amounts of cocaine and that his will was overborne by unrelenting government persistence."). Therefore, no sentencing entrapment occurred.

Having addressed Estrada's sentencing entrapment claim, we still need to briefly explore whether Application Notes 12 and 15 as stated in the Sentencing Guidelines (thus we are setting aside the issue of whether these Notes address sentencing entrapment) apply to Estrada's situation. See U.S.S.G. sec. 2D1.1, comment. (nn.12, 15). Application Note 15 centers around the issue of whether "the

government agent set a price for the controlled substance that was substantially below the market value of the controlled substance." U.S.S.G. sec. 2D1.1. This was not the case here. Agent Grobe testified, "It [the price of one kilogram of cocaine] can go down. But, generally, I've never seen it go down below 16,000 in this area. That's usually the rock bottom." Earlier, he had said that the wholesale price of a kilogram of cocaine in the Chicago area around January of 2000 was "[a]nywhere from 16- to 20,000, with an average of 18,000." The clear implications of Agent Grobe's testimony is that $16,000 was the lowest wholesale market price and that paying less than $16,000 for a kilogram of cocaine would be below market. Consequently, Estrada cannot prove that he was sold cocaine at below market prices, since Varela offered him the cocaine at $16,000. As for Application Note 12, Varela as discussed earlier, was reasonably capable of paying for five kilograms of cocaine, so even if the district court did not consider the additional two kilograms that originally Varela intended to give Estrada on credit, he still would be eligible for the same sentence. See U.S.S.G. sec. 2D1.1(c)(4). Thus, we affirm the district court's decision to find Estrada accountable for 5 to 15 kilograms of cocaine.

Conclusion

   For the reasons stated herein, we AFFIRM the decision of the district court.

FOOTNOTES

/1 During oral argument, we learned that the government recovered $60,000 from the parking lot at the Hillside Holiday Inn. An additional $20,000 was recovered from the restaurant owned by Estrada's brother, although it is not clear whether the $20,000 is connected in any way to this case. Therefore, the government may have confiscated with regard to this case either $60,000 or $80,000 and Varela would be due 25 percent of either amount--that is, he would be due either $15,000 or $20,000.

/2 Application Note 12 states, in relevant part:

If, however, the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon

quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing.

   Application Note 15 states, in relevant part:

If, in a reverse sting (an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant), the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted.