# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 04-2557, 04-2592

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

PIERRE DAWSON and ALPHONSO INGRAM,

*Defendants-Appellants*.

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 02 CR 688—**Elaine E. Bucklo**, *Judge*.

_____

ARGUED JUNE 3, 2005—DECIDED SEPTEMBER 28, 2005

_____

Before CUDAHY, POSNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*.  The defendants were convicted by a jury of federal drug offenses and sentenced to 300 months in prison (Ingram) and 360 months (Dawson). Among the grounds for reversal that they press on us with misplaced zeal in more than 130 pages of briefs is that in every trial of a federal drug offender the prosecution must prove that the defendant's offense had an actual impact on interstate or foreign commerce. Otherwise, they argue, the prosecution may exceed the regulatory power conferred on Congress by the commerce clause of the Constitution. The statutes under which the defendants were prosecuted, 21

U.S.C. §§ 841, 846, do not, it is true, make effect on commerce an element of the crime, and so no proof of such an effect was presented at the trial. But it is common knowledge that the traffic in most illegal drugs—certainly including cocaine, the drug involved in this case, very little of which is manufactured in the United States because no coca is grown here—is national or (in the case of cocaine) international rather than local. Of course there are local *sales* of the drugs, at the end of the commerce chain; but these, taken in the aggregate, certainly affect the interstate and international traffic in these drugs, and that is the only handle that Congress requires to be empowered by the commerce clause to legislate with respect to the local sales. *Gonzales v. Raich*, 125 S. Ct. 2195, 2205-06 (2005). The *Lopez* decision, on which the defendants principally rely, reaffirmed *Wickard v. Filburn*, 317 U.S. 111 (1942), which had held that wheat grown by a farmer for his own consumption was within the commerce power because it is traded in a national market and home consumption affects the amount available for that trade. *United States v. Lopez*, 514 U.S. 549, 559-60 (1995). Similarly, local sales of drugs affect the demand for their importation. *United States v. Thomas*, 159 F.3d 296, 297-98 (7th Cir. 1998).

The government's principal evidence of the defendants' guilt consisted of testimony and recordings by Oscar Diaz, who after years as a major drug dealer following his illegal entry into the United States had agreed to co-operate with the DEA in exchange for 20 percent of any proceeds of drug sales that the government recovered as a result of Diaz's efforts; he received additional compensation in an unknown amount. The DEA also, though apparently not pursuant to an explicit agreement with Diaz, forbore to inform the INS that he had, as the DEA knew, lied on his application for U.S. citizenship when he said he hadn't

committed any crimes. (By the time of trial, Diaz was a U.S. citizen.) He was also assured that as long as he continued cooperating and told the truth, he would not be prosecuted for his past drug dealing. Before and after becoming a government informant, Diaz sold cocaine to the defendants.

Diaz recorded (or transmitted to government agents who recorded) a number of his conversations, both telephonic and in person, with the two defendants. He later reviewed the tapes and testified at trial that they accurately recorded the conversations, although not completely; some words were unintelligible and Diaz did not have an independent recollection of what they were. There were also gaps in the tapes—sometimes the signal from the transmitter was interrupted, and sometimes Diaz had failed to start his recorder at the beginning of the conversation or had ended it before the conversation ended. There may also have been erasures, though these may have been of conversations that did not involve the defendants. No "chain of custody" was established; that is, the government could not account for every person who had had access to the recordings between when they were made and the trial.

Because of these irregularities, the defendants argue that the tapes were not "authenticated" and should therefore have been excluded from evidence. Fed. R. Evid. 901. Evidence that is not oral testimony must be shown to be what it purports to be rather than a forgery or other fabrication or an innocent misidentification. But there are no rigid rules, such as chain of custody, for authentication; all that is required is adequate evidence of genuineness. *United States v. Brown*, 136 F.3d 1176, 1181 (7th Cir. 1998); *United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001). (There are such rules for electronic surveillance governed by Title III, but Title III is inapplicable to conversations that, as here, are

recorded with the consent of one of the participants. 18 U.S.C. § 2511(2)(c); *United States v. Eschweiler*, 745 F.2d 435, 437 (7th Cir. 1984); *Meredith v. Gavin*, 446 F.2d 794, 798 (8th Cir. 1971).) The defendants do not deny that it is their voices on the tapes. Nor is there any indication of splicing or other alterations that might have changed the meaning of what they had actually said. The only complaint is that the gaps or erasures might contain exculpatory material, although there is no evidence that they do. Even if they did, this would not "de-authenticate," and hence make inadmissible, the tapes of the conversations that were recorded. *United States v. Robinson*, 956 F.2d 1388, 1395 (7th Cir. 1992); *United States v. Vega*, 860 F.2d 779, 790-91 (7th Cir. 1988); *United States v. Calderin-Rodriguez*, 244 F.3d 977, 987 (8th Cir. 2001). And it would not raise a *Brady* issue even if (though there is no indication of this) the government was aware of what was said in the conversations but not recorded, because the defendants, being parties to the conversation, were equally aware. *Brady* requires disclosure only of exculpatory material known to the government but not to the defendant. E.g., *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003); *Buie v. McAdory*, 341 F.3d 623, 625-26 (7th Cir. 2003); *Fullwood v. Lee*, 290 F.3d 663, 685-86 (4th Cir. 2002).

The defendants argue that Diaz should not have been allowed to testify at all (in which event he could not have authenticated the tapes, and so the government's case would have collapsed) because of the benefits he received in exchange for his assistance to the prosecution, in particular the 20 percent bounty that he received. The defendants imprecisely describe this as a contingent fee for his testimony. A bounty and a witness fee are different. A bounty is a reward for rendering a service that the offeror wants done, whether it's shooting wolves that prey on sheep or catching criminals who prey on humans. E.g., 19 U.S.C. § 1619;

*Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 665 (7th Cir. 2001); *United States v. Jennings*, 160 F.3d 1006, 1015 n. 3 (4th Cir. 1998); *Doe v. United States*, 100 F.3d 1576, 1581-82 (Fed. Cir. 1996); cf. *United States v. Cervantes-Pacheco*, 826 F.2d 310, 311-12 (5th Cir. 1987) (en banc). Here the bounty was for helping the authorities nail drug offenders. Although rather than being a flat fee it was a percentage of the money that the government recovered from the offenders, *United States v. Estrada*, 256 F.3d 466, 468 (7th Cir. 2001), this form of compensation is what economists call "incentive compatible" ("motivational" would be an alternative term for it): it gives the bounty hunter an incentive to concentrate on the biggest prey.

The bounty was not a contingent fee for testimony because it was paid whether or not Diaz testified. Since most cases, including forfeiture cases (and the forfeiture components of criminal cases), are settled rather than tried, probably Diaz usually earned the bounty without having to testify. Of course when he did testify, as in this case, his bounty may have been riding on the outcome (though this is unclear), giving him a monetary incentive to testify favorably to the government. From the standpoint of incentive to lie, a bounty based on an adjudicative outcome is much more suspect than one obtained simply by procuring a seizure of forfeitable goods. And the defendants are right to point out that paying witnesses (other than experts) for their testimony (beyond the tiny fees permitted, in the case of federal trials, by the Judicial Code, 28 U.S.C. § 1821) is forbidden. 18 U.S.C. § 201(c)(2). Even an expert witness, and *a fortiori* an occurrence witness, may not be paid more if the party for whom he is testifying wins the case. *Tagatz v. Marquette University*, 861 F.2d 1040, 1042 (7th Cir. 1988); *United States v. Cervantes-Pacheco, supra*, 826 F.2d at 313; *United States v. Gray*, 626 F.2d 494, 499 (5th Cir. 1980); *United States v. Palow*, 777 F.2d 52, 54 (1st Cir. 1985).

Yet whether violation even of that rule requires exclusion of the testimony from being used against a defendant is a separate question. *Tagatz v. Marquette University, supra,* 861 F.2d at 1042; *United States v. Valona,* 834 F.2d 1334, 1343-44 (7th Cir. 1987); *United States v. Cervantes-Pacheco, supra,* 826 F.2d at 316 (concurring opinion). Exclusion confers windfalls on the guilty and therefore, at least as a device for enforcing nonconstitutional rules, is disfavored. *United States v. Caceres,* 440 U.S. 741, 755-56 (1979) ("a rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures"); *Buntrock v. SEC,* 347 F.3d 995, 999 (7th Cir. 2003); *United States v. Newell,* 239 F.3d 917, 921 (7th Cir. 2001) ("exclusionary rules are disfavored as remedies for nonconstitutional violations of law"); *United States v. Gilbert,* 942 F.2d 1537, 1541-42 (11th Cir. 1991). An exclusionary rule would be not only costly but also gratuitous in the present setting, because a jury should be competent to discount appropriately testimony given under a powerful inducement to lie. An exclusionary rule for that class of evidence was rejected in *United States v. Condon,* 170 F.3d 687, 688-89 (7th Cir. 1999), and cases cited in that opinion. It should not be resurrected, whether in the form of the discredited "outrageous government conduct" doctrine here futilely pressed on us by the defendants, *United States v. Sherman,* 268 F.3d 539, 550 (7th Cir. 2001); *United States v. Boyd,* 55 F.3d 239, 241-42 (7th Cir. 1995); *United States v. Nolan-Cooper,* 155 F.3d 221, 229-30 (3d Cir. 1998), or by raising the bar of Rule 403 and presuming that evidence given under strong inducements—such as the bounty at issue here, not to mention permitting Diaz to become a citizen and escape criminal punishment for the drug dealing that he engaged in before he agreed to become a government informant—is so unreliable that its probative value is clearly outweighed by a tendency to confuse the jury.

Any *general* policy (whether enforced by exclusion or by some other means) against giving a witness inducements to testify, rather than relying entirely on his love of truth or the terrors of the oath, would require reinstating the old rule (illustrated by the trial of the eponymous hero of *The Pickwick Papers* for breach of promise) that the party to a case may not testify at all because he has an interest, pecuniary or otherwise, in the outcome and is therefore not a disinterested witness. Williams S. Holdsworth, *Charles Dickens as a Legal Historian* 132-35 (1928). Most of the key witnesses in cases of drug dealing and other "victimless" crimes (that is, crimes consisting of voluntary transactions, so that there is no *complaining* victim) are criminals testifying in the hope of obtaining leniency or other benefits from the government. Such testimony is frequently indispensable, and it is not worthless; Diaz's testimony, for example, was amply corroborated, and not only by the recordings.

Judges are in no position to evaluate the government's need to offer monetary or other inducements to the criminals whom it hopes to enlist in the "war against drugs." Should we tell the Justice Department that 20 percent was too great a bounty to pay Diaz? That 5 percent would have been sufficient? That too-generous bounties might actually induce people to *become* drug dealers, in the thought that if the business becomes too hot they can always enlist as bounty hunters for the DEA? Our job, so far as it relates to the question whether Diaz should have been excluded from testifying at all, is to make sure that grossly unreliable evidence is not used to convict a defendant. We do this by requiring (in effect) that the inducements be disclosed to the jury, which can use its common sense to screen out evidence that it finds to be wholly unreliable because of the inducements that the witness received.

*Wisehart v. Davis*, 408 F.3d 321, 323-24 (7th Cir. 2005). The more extravagant the blandishments, the more likely the jury is to discredit the witnesses who received them.

Another issue presented by the appeals concerns the judge's response to a note that she received from the jury during its deliberations. The note asked whether "given the wording [in the indictment] 'Pierre Dawson and Alfonso Ingram did conspire with each other . . .,' can one defendant be separate from the other? It's difficult to establish a separate verdict given the wording." The judge responded: "In answer to your question, a conspiracy involves an agreement between a defendant and one or more other persons to accomplish an illegal purpose. Therefore, it is possible to make an individual determination as to each defendant." The defendants argue that the judge should have said "*must* make an individual determination" rather than "*it is possible* to make an individual determination," since her wording may have been understood to mean that the jury didn't *have* to consider the guilt or innocence of each defendant separately.

But it is better for a trial judge to answer the question that the jury asks than another question, unless answering just the jury's question would entrench some misunderstanding revealed by their question. The jury asked "can one defendant be separate from the other" and the judge answered, "yes, one defendant can ['it is possible'] be separated from the other." Had the judge answered "not only can, but must," this might have set the jurors to scratching their heads, wondering what they had missed.

In her original instructions the judge had told the jury that "even though the defendants are being tried together, you must give each of them separate consideration . . . . You must separate consideration both to each count and to each

defendant." The jury was not questioning *that* instruction. It was asking whether it was possible, given that the defendants were accused of conspiring with each other, to convict (or acquit) one defendant but not the other. It *was* possible, as the judge instructed, but only if there were additional conspirators.

If the only conspirators were Dawson and Ingram (Diaz, who was working undercover for the government when the transactions for which the defendants were prosecuted were made, could not count as a conspirator, *United States v. Duff*, 76 F.3d 122, 127 (7th Cir. 1996)), then either both were guilty of conspiracy or neither. In that case, to tell the jury that they "must" separate the defendants might well have misled them, in part by giving undue emphasis to the "separate consideration" instruction. There was, however, evidence of other, though uncharged, conspirators with Dawson and Ingram in their very large drug business. And so the jury, if for example it thought the evidence of Ingram's participation in the conspiracy weak (the evidence of Dawson's participation was very strong), could "separate" the defendants and find only Dawson guilty of conspiracy. The supplemental instruction permitted, but rightly did not compel, such separation, since, to repeat, if the jury found that Dawson and Ingram were the sole conspirators, their verdict on the conspiracy count would have to be the same for both of them. It would, however, have been better had the instruction told the jury explicitly that the conspiracy could have involved other persons besides just the defendants and the informant.

In suppression hearings in two previous cases, involving other defendants, the trial judges had disbelieved testimony by three government agents who also testified for the prosecution in our case. Defense counsel in our case wanted to use those judges' rulings to impeach the three

witnesses' testimony. The judge refused on the basis of Rule 608(b) of the Federal Rules of Evidence, which provides that "specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence." Our defendants were not proposing to use extrinsic evidence, however, but merely to ask each witness whether a judge had disbelieved him or her in a previous case. But the error was harmless. In plea bargains that resolved the previous cases, the defendants had acknowledged that the witnesses whom the judges had disbelieved had been telling the truth. The prosecutor would have trotted out the plea bargains on redirect examination in our case, thereby neutering the cross-examination.

Ingram complains that he should not have been denied a sentencing discount for having been a minor participant in the conspiracy. U.S.S.G. § 3B1.2(b). The government argues that though Diaz's dealings were mainly with Dawson there was evidence that Ingram was actually the kingpin. The government points out that the higher you are in an illegal business, the less likely you are to be present at individual transactions, since that would increase your chance of being arrested. Leaders rationally as well as selfishly seek to insulate themselves from the risks to which their underlings are exposed, because a leader is a scarcer commodity than a follower. Steven D. Levitt & Sudhir Alladi Venkatesh, "An Economic Analysis of a Drug Selling Gang's Finances," 115 *Q.J. Econ.* 755, 761-62 (2000). The larger the transaction, however, the likelier the leader is to be present. At a sale of 38 kilograms of cocaine, Ingram carried the $269,000 in cash for the purchase price from Memphis, the headquarters of the gang, and assured Diaz that the deal would go through and that Diaz would get all the money. That was the talk

not of a courier but of a manager, Dawson's equal or superior. And another witness testified that it was Ingram who always took possession of the drugs that the gang held at its Memphis headquarters.

So we find no error, but since the sentencing determinations were made under the pre-*Booker* regime, we have to order the limited *Paladino* remand. *United States v. Paladino*, 401 F.3d 471, 483-84 (7th Cir. 2005).

WILLIAMS, *Circuit Judge*, dissenting. Whether it be termed a "contingent fee" or "bounty"—an expression even less palatable and more indicative of this practice—is a matter of semantics and here unimportant. What is important is the structure of the agreement that the government has brokered here with its witness, and that structure ultimately leaves the government witness financially motivated in the conviction of the defendants.

Here, as a part of his agreement with the government to serve as an informant, Diaz was to receive up to 20% of any money seized and forfeited as a result of his co-operation. Pursuant to the deal, if (and only if) a conviction or plea was secured, and the seized money forfeited, the informant would get a piece of the forfeiture. The majority says the threat of harm this arrangement poses is minimized because Diaz got paid regardless of whether or not he testified, and that most cases get settled rather than tried. But the case at bar is not most cases. This case was tried, and

Diaz's testimony was an integral part of it. Indeed, as the majority notes, "the government's case would have collapsed" without it. At bottom, the operative facts of this case are clear: Diaz would get proceeds from the Dawson and Ingram bust only if the defendants were convicted, and he testified for the government in the trial designed to secure that conviction. Put differently, Diaz was paid only if the party for whom he was testifying won the case.

There is little doubt that Diaz's bounty was "riding on the outcome" of the Dawson and Ingram prosecution. Diaz testified to the arrangement on direct examination by the government, admitting that he "could get up to 20 percent[1]." Even the government concedes that "Diaz stood to receive up to 20% of any money seized and forfeited resulting from Diaz's cooperation." Appellee Br. at 33. What's more, Diaz knew almost exactly how much was seized from the defendants at the time he testified. We know this because he offered testimony as to the exact dollar figure seized from Dawson and Ingram at the bust—$269,000.[2] Thus, not only was Diaz able to give his

---

[1] Trial Transcript at 180-81:

Q:    [W]hat's your understanding as to whether you will receive additional money for your cooperation in this case?

Diaz: They didn't tell me nothing. They just told me that if it was any moneys, I could get up to 20 percent.

Q:    Any money seized, that you can get up to 20 percent of the money that's seized, is that your understanding?

Diaz: Yes.

[2] Trial transcript at 181:

(continued...)

financial motivation in the defendants' conviction a rough dollar figure, but he also, by providing testimonial evidence as to the amount of currency the government seized from Dawson and Ingram, helped make the government's case for forfeiture itself.

Nor is it unclear whether the government pursued the forfeiture of those seized assets. The government sought those assets from the outset, as page three of the November 19, 2002, indictment against the two defendants clearly sets forth forfeiture allegations, naming "$280,000 in United States currency" subject to forfeiture pursuant to Title 21, United States Code, Section 853. That $280,000 figure included "more specifically funds in the amounts of $4239.00, $4273.00 and $269,005.00," as page one of the June 16, 2004 Motion of the United States for Entry of Preliminary Order of Forfeiture—filed on the heels of the defendants' February 4, 2004 conviction—reveals. Nor is there any doubt that those assets were in fact ultimately forfeited, as the district court entered preliminary orders toward that end against both Dawson (Minute Order, August 25, 2004) and Ingram (Minute Order, June 6, 2004). While it may be unclear whether Diaz takes his 20% proceeds in cash or cashier's check, we may say with sufficient certainty that the conviction of Dawson and Ingram will get Diaz paid.

------

(...continued)

Q:      How much money was seized in the first case?

Diaz: 269,000

Q:      Is that *this* case that you are talking about, the money for which you are testifying now?

Diaz: Yes.

As the majority acknowledges, there is a rule against paying witnesses an additional fee, if the party for whom they testify wins the case. See Maj. Op. at 5. The majority, however, would limit this rule to one of professional conduct rather than extend it to admissibility of evidence, *see Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1042 (7th Cir. 1988), predicting the threat of the"windfalls" that would surely come on the heels of an exclusionary rule. I do not discount the value inherent in avoiding windfalls, but to appreciate that value is not to say that other values do not here exist. Indeed, they do, and they are nothing less than due process and fairness to defendants.

These values too are important. In *United States v. Estrada*, 256 F.3d 466 (7th Cir. 2001), we expressed reservations about a fee arrangement with a witness that, like here, was dependent on the defendant's conviction. "Such an incentive structure," we said, "does little to enhance overall confidence in the criminal justice system." *Id.* at 472. Only because there was "overwhelming evidence" of the defendant's drug involvement did we conclude that the defendant's sentence did "not carry with it the specter of a miscarriage of justice." *Id.* Here, though, as the majority recognizes, the government's case could not have survived without Diaz's testimony.

Other circuits have also expressed reservations about this practice although, unfortunately, often in opinions that have long since been ignored if not abrogated or outright overruled. *See, e.g., United States v. Waterman*, 732 F.2d 1527, 1528 (8th Cir. 1984) (holding that a witness agreement contingent upon the outcome of the case "hampered the truth-finding function of the jury to a degree which cannot be reconciled with the fair procedures guaranteed by the due process clause of the fifth amendment"), *vacated en banc*, *id.* at 1533;

*Williamson v. United States*, 311 F.2d 441, 444 (8th Cir. 1962) (rejecting testimony elicited through an outcome-dependent agreement in keeping with "the duty of the courts in federal criminal cases to require fair and lawful conduct from federal agents in the furnishing of evidence of crimes"), *overruled by United States v. Cervantes-Pacheco*, 826 F.2d 310, 316 (5th Cir. 1987).

Yet the specter of these values persists nonetheless. As our sister circuit noted in *United States v. Dailey*, 759 F.2d 192, 201 n.9 (1st Cir. 1985), "benefits made contingent upon subsequent indictments or convictions skate very close to, if indeed they do not cross, the limits imposed by the due process clause." As the *Dailey* court stated, it could "think of no instance in which the government would be justified in making a promised benefit contingent upon the return of an indictment or a guilty verdict." *Id.* at 201. And I certainly acknowledge that this circuit has expressly rejected the doctrine of "outrageous government conduct" first posited by the Court in *United States v. Russell*, 411 U.S. 423, 431-32 (1973).[3] *See United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995) (holding that "the doctrine [of outrageous government conduct] does not exist in this circuit"). However, should the government continue to utilize these agreements, I am confident that another opportunity to revisit that doctrine will not be long off.

I should be comforted, according to my colleagues, by the merits of vigorous cross-examination and jury com-

---

[3] In *Russell*, the Supreme Court suggested that there may be "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.*

petency in ferreting out "testimony given under a powerful inducement to lie." I find greater comfort, however, in the text of the since vacated *Waterman* decision. That panel rejected such reliance on the jury's role in making credibility determinations: "[W]e see no place in due process law for positioning the jury to weed out the seeds of untruth planted by the government. Certainly [the witness] might have lied regardless of the contingency agreement and the jury was generally commissioned to determine the truth of his testimony; but that is no reason for the government to give him further incentive to selectively remember past events in a manner favorable to the indictment or conviction of others." *Waterman*, 732 F.2d at 1532. Indeed, the impact on "the truth-finding function of the jury" is what led the panel to find such arrangements in contravention of due process in the first place. *Id.* at 1528.

While the precedent both within and without this circuit suggests that I might swim against the tide, there are nonetheless sub-currents of which the government should take note before again brokering these bargains. *See, e.g., Estrada*, 256 F.3d at 472; *United States v. Innamorati*, 996 F.2d 456, 482 (1st Cir. 1993) (upholding admissibility of testimony where payment to the witness "was completed several days prior to trial, and the payment was thus not directly dependent upon the result of [the witness's] testimony in court"); *Dailey*, 759 F.2d at 201. The government might also consider the canons of professional conduct, which forbid the practice of predicating witness payment on case outcomes. *See* Maj. Op. at 5 ("Even an expert witness, and *a fortiori* an occurrence witness, may not be paid more if the party for whom he is testifying wins the case."); *Cervantes-Pacheco*, 826 F.2d at 316 (Rubin, J., concurring) (noting that "employment of a witness for a fee contingent upon victory for the party in whose favor he testifies

is a violation of both the Model Rules of Professional Conduct [Rule 3.4] and the Code of Professional Responsibility [DR 7-109]"); Model Code of Professional Responsibility DR 7-109(C) (1980) ("A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case.").

I recognize that witnesses can receive immunity or reduced sentences in exchange for their truthful testimony, *see, e.g., United States v. Blassingame*, 197 F.3d 271, 285 (7th Cir. 1999), and I have no quarrel with that practice. It is one thing to accept the myriad and sometimes sordid realities that motivate witnesses to testify; but it is another affirmatively to invite inherently tainted testimony. The danger of these outcome-contingent agreements is real; "[t]he opportunities for abuse . . . too obvious to require elaboration." *Williamson*, 311 F.2d at 444. Nor is this a matter of quibbling over the exact percentage that the government may pay to secure supporting testimony, for that, as my colleagues rightly note, is not within the province of the judicial department. What is a matter of judicial concern, however, is a defendant's right to a fair trial, and it is that concern that renders any percentage of moneys paid to a witness improper when such payment depends upon the conviction of another.

For these reasons, I respectfully dissent.

A true Copy:

      Teste:

                      _____

                      *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*